IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

CORAZON TABION,
    Plaintiff,

v.

Faris Mufti and Lana Mufti,
    Defendants.

Civil Action No. 94-1481-A

FILED
JAN 27 1995
CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## STATEMENT OF INTEREST OF THE UNITED STATES

### INTRODUCTION

The Court has invited the United States to submit a brief on the proper construction of "commercial activity" as that term is used in Article 31(1)(c) of the Vienna Convention on Diplomatic Relations (the "Vienna Convention"), April 18, 1961, 23 UST 3227.[1] (Ellis, J., (Order, Dec. 28, 1994)). Article 31(1)(c) eliminates civil immunity where a diplomat engages in a "commercial activity . . . in the receiving State outside his official functions." The United States has an interest in ensuring the proper interpretation of the Vienna Convention not only in view of the foreign relations concerns that are implicated but also

---

[1] The United States may appear in any court of the United States to "attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517.

because the United States relies upon this treaty for the protection of its own personnel abroad.

The plaintiff, Corazon Tabion, is suing the Counselor of the Embassy of the Hashemite Kingdom of Jordan, Faris Mufti, and his wife, Lana Mufti, for allegedly violating, inter alia, the Fair Labor Standards Act during plaintiff's employment as a domestic by the defendants. Defendants contend that diplomatic immunity shields them from suit, and have filed a motion to quash service of process. Plaintiff argues that defendants' employment of her to perform domestic services constitutes a "commercial activity" for which no immunity is provided under Article 31(1)(c) of the Vienna Convention. See Plaintiff's Opposition to Defendants' Motion to Quash Service of Process (Dec. 15, 1994).

BACKGROUND

By certification dated December 2, 1994, the Assistant Chief of Protocol of the United States Department of State certified that Mr. Faris Mufti was duly notified on September 11, 1991 to the Department of State as a First Secretary at the Embassy of Jordan. See Exhibit A to Defendants' Brief In Support of Motion to Quash Service of Process, dated Dec. 5, 1994. Mr. Mufti is now serving as Counselor at the Embassy. Id. The Department of State was also notified at the time of Mr. Mufti's appointment that Mrs. Lana Mufti is a family member forming part of Mr. Mufti's household. Id.

Under Article 31 of the Vienna Convention, and subject to the exceptions enumerated in that article, Mr. Mufti enjoys immunity from the civil and administrative jurisdiction of the

- 3 -

United States. Mrs. Mufti enjoys a similar immunity pursuant to Article 37(1) of the Vienna Convention.

## ARGUMENT

Article 31(1) of the Vienna Convention on Diplomatic Relations provides in pertinent part as follows:

> A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:
>
> . . .
>
> (c) an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions.

Article 31 is one of several articles of the Vienna Convention that provide special legal protection for diplomats. As the preamble to the Vienna Convention makes clear, immunities are accorded "not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States." By necessity, diplomats must carry out their work in a foreign -- sometimes even hostile -- environment. Jurisdictional immunity ensures their ability to function effectively by insulating them from the disruptions that would be associated with litigation in that environment.[2] This protection was regarded as so important that for almost two centuries the United States accorded diplomats absolute immunity. See 22 U.S.C. §§ 252-254 (statute in force from 1790 to 1978).

---

[2] Diplomats remain subject to the jurisdiction of their own country (Vienna Convention, Article 31(4)).

- 4 -

When the United States became a party to the Vienna Convention, it recognized certain exceptions to diplomatic immunity. This case raises the question of the extent to which the commercial activity exception in the Vienna Convention departs from the traditional rule of absolute immunity for diplomats.

In the view of the United States, the term "commercial activity" as used in Article 31(1)(c) focuses on the pursuit of trade or business activity; it does not encompass contractual relationships for goods and services incidental to the daily life of the diplomat and family in the receiving State.[3] This interpretation is entitled to great weight. See Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85 (1982) ("the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight. Kolovrat v. Oregon, 366 U.S. 187, 194 (1961)"). The United States' interpretation of Article 31(1)(c) is not only consistent with the broad purposes immunity is intended to serve, but is also strongly supported by a

---

[3]  While the commercial activity exception in the Vienna Convention may be said to represent an extension of the general principle of restrictive immunity to the area of diplomatic law, the scope of the commercial activity exception in the Vienna Convention is to be distinguished from the broad concept of "commercial activity" applicable to foreign states later embodied in the Foreign Sovereign Immunities Act of 1976. See 28 U.S.C. §§ 1330, 1602 et seq.; See also H.R. Rep. No. 1487 at 8, 12, 21, 94th Cong, 2d Sess., reprinted in 1976 U.S.C.C.A.N. 6604 at 6606, 6610, 6620 (distinguishing sovereign immunity from diplomatic immunity and stating that the bill was not "intended to affect either diplomatic or consular immunity" and that it dealt "only with the immunity of foreign states and not its diplomatic or consular representatives"). Various scholarly commentaries support this distinction. See n.7, infra.

- 5 -

consideration of the negotiating history of the Vienna Convention, subsequent statements by Executive Branch officials, and the works of numerous scholarly commentators writing in the area of diplomatic law. [4]

I. THE NEGOTIATING HISTORY OF THE VIENNA CONVENTION ON DIPLOMATIC RELATIONS SUPPORTS A NARROW INTERPRETATION OF THE COMMERCIAL ACTIVITY EXCEPTION

The Draft for the Codification of the Law Relating to Diplomatic Intercourse and Immunities proposed for the United Nations' International Law Commission ("ILC") by its Special Rapporteur in 1955 contained no exception to immunity for commercial activity. See Report Presented by Mr. A.E.F. Sandstrom, Special Rapporteur, U.N. Doc. A/CN.4/91, [1955] 2 Y.B. Int'l L. Comm'n 16, U.N. Doc. A/CN.4/SER.A/1955/Add.1. An amendment providing an exception to immunity for acts "relating to a professional activity outside [the diplomatic agent's] official duties" was first introduced into the Draft Articles at the 402nd meeting of the ILC, during its Ninth Session, on May 22, 1957. Summary Records of the 402nd Meeting, [1957] 1 Y.B. Int'l L. Comm'n 97, U.N. Doc. A/CN.4/SER.A/1957. Mr. Verdross, the author of the proposed amendment, based his proposal on Article 13 of the 1929 resolution of the Institute of

---

[4] The importance of these sources as interpretative aids to elucidate the meaning of a treaty is well recognized. See, Eastern Airlines, Inc. v. Floyd, 499 U.S. 530 (1991); Articles 31-32 of the Vienna Convention on the Law of Treaties, May 23, 1969, reprinted in 8 I.L.M. 679 (1969); Article 38 of the Statute of the International Court of Justice, June 26, 1945, 59 Stat. 1031, T.S. 993, 3 Bevans 1153. We also note that we are unaware of any reported decisions which provide any guidance in interpreting the term "commercial activity" in Article 31(1)(c).

- 6 -

International Law, which referred only to "professional" activity. The proposed amendment was also described as being akin to Article 24, paragraph 2 of the 1932 Harvard Draft Convention on Diplomatic Privileges and Immunities (the "Harvard Draft"). The Harvard Draft referred to "business" as well as "professional" activity as follows:

> A receiving state may refuse to accord the privileges and immunities provided for in this convention to a member of a mission or to a member of his family who engages in a business or who practices a profession within its territory, other than that of the mission, with respect to acts done in connection with that other business or profession.

Summary Records of the 402nd Meeting, supra, at 97 (quoting Art. 24, para. 2 of the Harvard Draft). Mr. Verdross' proposed amendment was intended to address ordinary contractual relationships for goods and services incidental to daily life. This is evidenced by Mr. Verdross' reference to the Harvard Draft and his observation that the cases to which the amendment related were "comparatively rare." Id. at 97. Several ILC members suggested that the proposal was unnecessary since it aimed at activity in which diplomats rarely engaged. Id. at 97-98.

As formulated in 1957, at the ILC's Ninth Session, the ILC's provisional draft eliminated civil and administrative immunity for actions "relating to a professional or commercial activity exercised by the diplomatic agent in the receiving State and outside his official functions." Report of the Commission to the General Assembly, U.N. Doc. A/3623, reprinted in [1957] 2 Y.B. Int'l L. Comm'n 139, U.N. Doc. A/CN.4/SER.A/1957/Add.1. The

ILC's provisional draft was submitted to governments for comment. See <u>Diplomatic Intercourse and Immunities: Summary of Observations Received from Governments and Conclusions of the Special Rapporteur</u>, U.N. Doc.A/CN.4/116.  Australia commented that the term "commercial activity" required some definition. The Special Rapporteur explained that "the use of the words 'commercial activity' as part of the phrase 'a professional or commercial activity' indicates that it is not a single act of commerce which is meant, by [sic] a continuous activity." [5] <u>Id</u>. at 56.  In responding to the United States' comment that the commercial activity exception went beyond existing international law, the Special Rapporteur described the exception in terms of activity that was <u>inconsistent</u> with diplomatic status.  He commented as follows:

> In case (c), the considerations were as follows.  A condition of the exercise of a liberal profession or commercial activity must be that the client should be

---

[5]   One leading authority has described the Vienna Convention's use of "commercial activity" in these terms:

> It is clear that the ideas of remuneration and of a <u>continuous</u> activity are central to the purpose of Article 31(1)(c).  Although the provision is drafted in unnecessarily wide terms it is not intended to cover commercial contracts incidental to the ordinary conduct of life in the receiving State.  If one accepts that Article 31(1)(c) is to be interpreted in this sense it becomes clear that whereas the speculative activities of a diplomat on the Stock Exchange would come within the exception to immunity, contracts of personal loan would not, nor would contracts entered into for the purpose of educating the children of a diplomatic agent or otherwise supplying him and his family with any kind of goods or services.

Denza, <u>Diplomatic Law</u> 166-67 (1976) (emphasis in original).

> able to obtain a settlement of disputes arising out of the professional or commercial activities conducted in the country. It would be quite improper if a diplomatic agent, <u>ignoring the restraints which his status ought to have imposed upon him</u>, could, by claiming immunity, force the client to go abroad in order to have the case settled by a foreign court.

<u>Id</u>. at 55-56 (emphasis added).

At its Tenth Session in 1958, the ILC adopted a final draft convention with a commercial activity exception to civil and administrative immunity. As the records from this session show, the Rapporteur and ILC's Chairman viewed the commercial activity exception as focussing on the pursuit of private trade or business activity. They responded to a member's comment that he had understood the commercial activity exception to cover even isolated commercial transactions as follows:

> Sir Gerald FITZ MAURICE, Rapporteur, doubted the advisability of Mr. Zourek's suggestion. Paragraph 1(c) of the article applied to cases where a diplomatic agent conducted a regular course of business 'on the side.' Such isolated transactions as, for instance, buying or selling a picture, were precisely typical of the transactions not subject to the civil jurisdiction of the receiving State. Annoying as it might be for the other parties to such transactions in the event of a dispute, it was essential not to except such transactions from the general rule for, once any breach was made in the principle, the door would be open to a gradual whittling away of the diplomatic agent's immunities from jurisdiction.

> The CHAIRMAN pointed out that the article referred to 'commercial activity.' A single transaction would hardly constitute 'commercial activity.' Of course, even a single plunge in the waters of trade might suffice, but it must be the waters of trade.

<u>Summary Records of the 476th Meeting</u>, [1958] 1 Y.B. Int'l L. Comm'n 244, U.N. Doc. A/CN.4/SER.A/1958. The ILC's Commentary on this provision, as adopted in 1958, also shows that the term

- 9 -

"commercial activity" did not encompass the usual procurement of goods and services needed in the diplomat's daily life, but rather focussed on activities that were normally inconsistent with a diplomat's position. The commercial activity exception was explained as follows:

> The third exception arises in the case of proceedings relating to a professional or commercial activity exercised by the diplomatic agent outside his official functions. It was urged that activities of these kinds are normally wholly inconsistent with the position of a diplomatic agent, and that one possible consequence of his engaging in them might be that he would be declared persona non grata. Nevertheless, such cases may occur and should be provided for, and if they do occur the persons with whom the diplomatic agent has had commercial or professional relations cannot be deprived of their ordinary remedies.

Report of the Commission to the General Assembly, U.N. Doc. A/3859, reprinted in [1958] 2 Y.B. Int'l L. Comm'n 98, U.N. Doc. A/CN.4/SER.A/1958/Add.1.

The ILC's draft convention was considered at the United Nations Conference on Diplomatic Intercourse and Immunities in 1961. The Department of State's instructions to the United States delegation at that Conference expressed the following understanding of the commercial activity exception:

> Although states have generally accorded complete immunity to diplomatic agents from criminal jurisdiction, there has been a reluctance in some countries to accord complete immunity from civil jurisdiction particularly where diplomats engage in commercial or professional activities which are unrelated to their official functions. While American diplomatic officers are forbidden to engage in such activities in the country of their assignment, other states have not all been so inclined to restrict the activities of their diplomatic agents. Subparagraph c) of paragraph 1 would enable persons in the receiving State who have professional and business dealings of a non-diplomatic character with a diplomatic agent to have the same recourse against him in the courts as

they would have against a non-diplomatic person engaging in similar activities.

7 <u>Digest of Int'l Law</u> 406 (Whiteman 1970) (emphasis added). The United States view -- that the commercial activity exception in Article 31(1)(c) focussed on the kind of activity in which diplomats should not be engaging -- was borne out in the treatment of the issue at the Conference.

At the Conference, commercial activity was considered in the context of a new article proposed by Colombia, which is now Article 42 of the Vienna Convention. Article 42 provides that "[a] diplomatic agent shall not in the receiving State practise for personal profit any professional or commercial activity." The delegates' discussion of Colombia's proposed amendment shows that the delegates envisioned Article 42 as addressing only the pursuit of active trade or business activity. <u>See</u>, <u>e.g.</u>, the statements of the representatives of Ceylon ("the supporters of the proposed new article had in mind a regular professional activity from which a permanent income was derived, and not an occasional activity, particularly of a cultural character"); Italy (favoring the proposal "provided that it was made clear ... that the intention was to prevent diplomats from engaging in gainful activities such as commerce, industry or a regular profession"); Malaya (the proposal "should be limited to commercial activity for personal profit"). <u>United Nations Conference on Diplomatic Intercourse and Immunities: Official Records</u>, Vol. I at 212-13 (1962), U.N. Doc. A. CONF.20/14.

- 11 -

The Conference delegates saw the commercial activity exception contained in Article 31(1)(c) and the ban on commercial activity contained in Article 42 as closely intertwined. Indeed, Colombia and Italy proposed deletion of the commercial activity exception in Article 31(1)(c) as unnecessary in view of the prohibition in Article 42. The Conference voted, however, to retain the exception following a discussion in plenary session in which several delegates pointed out that there could be no assurance that diplomatic agents would not engage in prohibited activities, and, in any event, the prohibition did not apply to their family members who would otherwise enjoy immunity for such activities. See United Nations Conference on Diplomatic Intercourse and Immunities: Official Records, supra at 19-21; United Nations Conference on Diplomatic Intercourse and Immunities: Report of the Delegation of the United States of America, reprinted in Vienna Convention on Diplomatic Relations, together with the Optional Protocol Concerning the Compulsory Settlement of Disputes, Executive H, 88th Cong., 1st Sess. at 58. [6]

---

[6] Numerous commentators have discussed the commercial activity exception of Article 31(1)(c) with specific reference to the private professional and commercial activity that is prohibited in Article 42. See, e.g., Murty, The International Law of Diplomacy: the Diplomatic Instrument and World Public Order 356 (1989); McClanahan, Diplomatic Immunity 130-31 (1989); Dembinski, The Modern Law of Diplomacy 207 (1988); Brown, Diplomatic Immunity: State Practice under the Vienna Convention on Diplomatic Relations, 37 Int'l & Comp. L. Q. 53, 76 (1988); Satow's Guide to Diplomatic Practice 126-27 (Fifth Edition 1979); Cahier and Lee, Vienna Conventions on Diplomatic and Consular Relations 29 (1969); Hardy, Modern Diplomatic Law 62 (1968); cf. also Restatement (Third) of the Foreign Relations Law of the United States, §464, Reporters' Note 9 at 468 (1987).

All other proposals to provide additional exceptions to immunity for claims for damages caused by a diplomatic agent were rejected. <u>Report of the Delegation of the United States of America</u>, <u>supra</u> at 49.

II. THE EXECUTIVE BRANCH HAS NARROWLY INTERPRETED THE COMMERCIAL ACTIVITY EXCEPTION IN THE VIENNA CONVENTION

The Vienna Convention was submitted to the Senate for advice and consent to ratification on May 14, 1963. In 1965, the Department of State's Legal Adviser, Leonard C. Meeker, described the three exceptions to immunity contained in Article 31(1) in narrow terms in a hearing before a subcommittee of the Senate Foreign Relations Committee:

> **Senator CHURCH.** These provisions, then, impose certain limitations on the privileges and immunities that heretofore have been recognized?
>
> **Mr. MEEKER.** They do. They narrow the immunities somewhat. Where it is a hundred percent today, it will be reduced <u>in these relatively minor respects</u> for diplomatic agents.

<u>Vienna Convention on Diplomatic Relations: Hearing on Executive H, 88th Cong., 1st Sess. before the Subcomm. of the Senate Comm. on Foreign Relations</u>, 89th Cong., 1st Sess. 7 (1965) (emphasis added). In addition, a written analysis of the treaty prepared by the Department of State and submitted to the Committee was made a part of the hearing record. This analysis states that "Paragraphs 1 and 3 [of Article 31] <u>slightly</u> <u>narrow</u> the complete immunity from the civil jurisdiction of the United States presently granted... to diplomatic agents." <u>Id</u>. at 54; <u>reprinted in Digest</u>, <u>supra</u> at 410 (emphasis added).

- 13 -

The Vienna Convention entered into force for the United States on December 13, 1972. Subsequent congressional hearings have made clear the limited scope of the commercial activity exception in Article 31(1)(c). In a hearing before the Senate Foreign Relations Committee on legislation that resulted in the Diplomatic Relations Act of 1978, which was intended to give full effect to the Vienna Convention, Senator Sarbanes engaged in the following exchange with then current and former representatives of the Department of State (Horace F. Shamwell, Jr., Deputy Assistant Legal Adviser for Management; Hampton Davis, former Assistant Chief of Protocol; and Richard Gookin, Assistant Chief of Protocol for Diplomatic and Consular Liaison):

> Senator SARBANES. How about private dealings of one sort or another?
>
> Mr. SHAMWELL. To the extent the diplomat does not have immunity and there is an express exception for private dealings and without the scope of his official duties, we would favor no loopholes under those circumstances.
>
> Mr. DAVIS. But so far as his private debt, damage suits or, let us say, damage to furniture in an apartment or something. I think we would say that there is no guarantee of recourse or there is no recourse through the courts and other than the State Department's using its good offices, which have often been successful but certainly not 100 percent successful, there can be no guarantee nor do we feel that the United States should be an insurer of all civil claims against diplomats.
>
> Senator SARBANES. What claims are those that you use as an example?
>
> Mr. DAVIS. The ordinary variety; you run up a bill and don't pay your American Express bill and you don't pay Hecht's or Woodward & Lothrop or any of the multitude of civil types of claims that can arise apart from this.
>
> . . .

- 14 -

Senator SARBANES. In those instances, you would allow them to interject the defense of diplomatic immunity which would not ordinarily be available in that transaction, is that correct?

Mr. DAVIS. Yes, as far as a diplomatic person is concerned.

Senator SARBANES. Is the reason you do that related to the nature of our relationships with other countries and their representatives; in other words, the whole history that lies behind diplomatic immunity, is that correct?

Mr. DAVIS. Yes, and, in fact, it is a protection that is guaranteed under international law.

. . .

Senator SARBANES. Is the American express card a commercial activity outside of their official action?

Mr. SHAMWELL. That is not our interpretation. It relates primarily to private business dealings, such as engaging in some outside profitmaking activity and not merely opening up a charge account and failing to pay your bill.

Senator SARBANES. So an American diplomatic person in London can go to Harrods and run up a bill and there is no way that Harrods can move against him consistent with the way they move against any other customer under English law, is that correct?

Mr. GOOKIN. It is correct but, on the other hand, I think the American Embassy would take a dim view of such a practice by any member of the mission and would seek to remedy that situation promptly.

Diplomatic Immunity Legislation: Hearing on H.R. 7819 before the Senate Comm. on Foreign Relations, 95th Cong., 2d Sess. 47-49 (1978). [7]

---

[7] Several commentators have specifically stated that the commercial activity exception in the Vienna Convention should not be interpreted to apply to ordinary debt. See Sen, A Diplomat's Handbook of International Law and Practice 144 (3rd Rev'd Ed. 1988) (the Vienna Convention exceptions do not allow an action
(continued...)

- 15 -

In a Congressional hearing on diplomatic privileges and immunities in 1988, the Department of State submitted a formal response for the record expressing its position on the limited scope of the commercial activity exception as follows:

> The comprehensive civil immunity of diplomatic agents, however, means that they do enjoy immunity from actions relating to many personal debts. The exception to immunity for actions 'relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions' (VCDR Art. 31(1)(c)) limits the diplomat's immunity in some personal matters. Thus, for example, dependents of diplomats who are employed in the receiving state have no civil and administrative immunity for actions relating to that employment. This exception, however, does not extend to all personal debts of diplomatic personnel. 'The ideas of remuneration and of a <u>continuous</u> activity are central to the purpose of Article 31(1)(c)....[I]t is not intended to cover commercial contracts incidental to the ordinary conduct of life in the receiving state.' Denza, <u>Diplomatic Law</u> 166 (1976). Thus, the exception to diplomatic immunity contained in Article 31(1)(c) is narrower than the

---

[7](...continued)
against a diplomat for, among other things, "non-payment of debts or tradesman's bills for articles supplied for his consumption, non-payment of rent or violation of the conditions of a lease, recovery of hire charges or repair bills, and compensation for loss or injury caused to a person or property due to motor car accidents or other forms of default"); <u>Oppenheim's International Law</u>, Vol I, 1092-903 (9th Ed. 1992)(noting that diplomatic agents may not be sued for debts); <u>See also</u> Lewis, <u>State and Diplomatic Immunity</u> 140 (3rd Edition 1990) (Article 31(1)(c) exception was "not intended to cover commercial contracts incidental to the ordinary conduct of life" and in this regard the exception "is substantially different from the exception to state immunity, which applies to any contract that involves a commercial transaction") (citation omitted); <u>Oppenheim</u>, <u>supra</u> at 1094-95 (noting that "the distinction between private acts and acts done in the exercise of a diplomatic mission's functions, with immunity only being granted for the latter, has generally not been adopted in relation to personal diplomatic immunities (nor is it adopted in the Vienna Convention), although a similar distinction has been widely adopted in relation to sovereign immunity").

- 16 -

exception to sovereign immunity contained in the FSIA [Foreign Sovereign Immunities Act].  (The FSIA defines a commercial activity as 'either a regular course of commercial conduct or a particular commercial transaction or act.'  28 U.S.C. 1603(d)).

<u>The Diplomatic Privileges and Immunities Act:  Hearing before the Subcomm. on International Operations of the House Comm. on Foreign Affairs</u>, 100th Cong., 2d Sess. 268-69 (1988) (emphasis in original).  <u>See also</u> <u>id.</u> at 50, 187, 189-209, 260, 270. [8]

---

[8] The Department of State has issued circular diplomatic notes addressing, respectively, the employment of domestic servants and the prohibition on professional and commercial activity contained in Article 42.  While the note reminding missions of the Article 42 ban refers in that context to the commercial activity exception of Article 31 (1)(c), the note discussing responsibilities regarding domestic servants makes no reference to either Article 31(1)(c) or Article 42.  See <u>Cumulative Digest of United States Practice in International Law 1981-1988, Book I</u> at 961-63, 966-68 (1993).

- 17 -

## CONCLUSION

For the foregoing reasons, the term "commercial activity" as used in Article 31(1)(c) of the Vienna Convention should be interpreted as focussing on the pursuit of trade or business activity; it should not include contractual relationships for goods and services incidental to the daily life of the diplomat and his family in the receiving State.

                                Respectfully submitted,

OF COUNSEL:                    FRANK W. HUNGER
                                        Assistant Attorney General

JONATHAN B. SCHWARTZ
Deputy Legal Adviser
Department of State             _____
Washington, DC 20520            VINCENT M. GARVEY
                                        Deputy Director

                                        _____
                                        DAPHENE R. McFERREN
                                        Trial Attorney
                                        Department of Justice
                                        Civil Division
                                        901 E Street, N.W., Room 1014
                                        Washington, DC  20530
                                        Telephone:  (202) 616-5084

                                        RICHARD PARKER
                                        Assistant United States
                                            Attorney
                                        1101 King Street, Suite 502
                                        Alexandria, VA 22314
                                        (703) 706-3700
                                        Appearing pursuant to
                                        28 U.S.C. § 517

                                        Counsel for the United States

DATED:  January 27, 1995

- 18 -

CERTIFICATE OF SERVICE

I hereby certify this 27th day of January 1995, that I served a copy of the foregoing Statement of Interest by the United States by first-class, postage prepaid, mail to:

Earl F. Glock, Esq.
O'Connell & Glock, P.C.
Suite 202
1620 Eye Street, N.W.
Washington, DC 20006-4005


Joseph J. Aronica, Esq.
Mudge Rose Guthrie Alexander & Ferdon
2121 K Street, N.W., Suite 700
Washington, DC 20037

Daphene R. McFerren, Esq.