## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LUCIA MABEL GONZALEZ PAREDES** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 06-0089** |
| ) | |
| **JOSE LUIS VILA, et al.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |

### STATEMENT OF INTEREST OF THE UNITED STATES

The United States, by and through its undersigned counsel, respectfully submits this

Statement of Interest pursuant to 28 U.S.C. § 517,[1] and in response to the Court's invitation to

submit a statement of its views concerning certain issues in the above-referenced action.  In

particular, the Court asked for the Government's views concerning:  1) the proper construction of

"professional or commercial activity" as that phrase is used in Article 31(1)(c) of the Vienna

Convention on Diplomatic Relations (the "Diplomatic Relations Convention"), done April 18,

1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, entered into force for the United States December 13,

1972; and 2) the relevance of caselaw interpreting "commercial activity" under the Foreign

Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.* to the interpretation of

"commercial activity" under the Diplomatic Relations Convention.

The United States submits the following views because it has important interests in the

---

[1]  That statute provides: "The Solicitor General, or any officer of the Department of
Justice, may be sent by the Attorney General to any State or district in the United States to attend
to the interests of the United States in a suit pending in a court of the United States. . . ." 28
U.S.C. § 517.

correct interpretation and application of the Diplomatic Relations Convention in United States courts in order to fulfill its obligations to its treaty partners and to ensure that its diplomats abroad are afforded appropriate reciprocal protections by other nations.  First, a diplomat is not engaged in a "commercial activity" under the Diplomatic Relations Convention when he employs a domestic worker.  This is true even if the worker is hired to facilitate the pursuit of academic studies.  Such studying does not constitute "professional activity" under the Diplomatic Relations Convention.  The Department of State's issuance of circular diplomatic notes concerning the hiring of domestic workers by diplomatic agents does not change this interpretation of the Diplomatic Relations Convention.  Second, caselaw interpreting "commercial activity" under the FSIA should not be used to interpret that phrase in the Diplomatic Relations Convention.  The treaty and the statute address different doctrines and have different histories.  Accordingly, they have different standards for what constitutes "commercial activity."

## BACKGROUND

Plaintiff, Lucia Mabel Gonzalez Paredes, is suing Counselor Jose Luis Vila, a diplomat of the Embassy of the Argentine Republic, and his wife, Monica Nielsen, for allegedly violating the Fair Labor Standards Act (29 U.S.C. §§ 201 *et seq.*) and various District of Columbia wage and payment laws (§§ 32-1001-1003, *et seq.* and §§ 32-1301-1310, *et seq.*) while they employed her as a domestic worker.  See Plaintiff's Complaint (1/18/06) (Ex. A).  Plaintiff also raises District of Columbia law claims of breach of contract and unjust enrichment.  See id.  Defendants have filed a motion to quash service of process and to dismiss the complaint on grounds that diplomatic immunity shields them from suit.  See Defendants' Motion to Quash Service of Process and Dismiss Complaint (6/15/06) (Ex. B).

2

Plaintiff makes several arguments supporting her position that defendants are not immune from this suit. First, she maintains that defendants' employment of her to perform domestic services constitutes a "commercial activity" for which no immunity is provided under Article 31 (1)(c) of the Diplomatic Relations Convention. See Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Quash Service of Process and Dismiss Complaint at 12-18 (8/25/06) (Ex. C). Second, she argues that, regardless of whether her employment would normally be "commercial," she was retained so that Ms. Nielsen, a lawyer, could pursue an L.L.M., and that her claim is thus "related to a professional activity" within the meaning of Article 31(1)(c). See id. at 8-12. Finally, Plaintiff argues that Defendants have lost their immunities because they failed to pay her in accordance with their contract and thus acted contrary to Department of State requirements, expressed in circular diplomatic notes, that diplomats enter into contracts with domestic workers concerning the terms of employment. See id. at 22-29. For purposes of this statement of interest, the United States expresses no view on the merits of the case.

By certification dated September 25, 2006, the Assistant Chief of Protocol of the United States Department of State certified that Mr. Jose Luis Vila was duly notified on May 23, 2003 to the Department of State as a diplomatic agent of the Embassy of the Argentine Republic. See Exhibit 2 to Defendants' Response to Plaintiff's Opposition to Motion to Quash Service of Process and Dismiss Complaint (10/10/2006) (Ex. D). Mr. Vila continues to serve in that capacity. See id. The Department of State was also notified at the time of Mr. Vila's appointment that Mrs. Monica Nielsen is Mr. Vila's spouse residing in his household. See id. Under Article 31(1)(c) of the Diplomatic Relations Convention, and subject to the exceptions enumerated in that

3

article, a diplomatic agent enjoys immunity from civil and administrative jurisdiction of the

United States.  Members of the family of the diplomatic agent forming part of his household enjoy

a similar immunity pursuant to Article 37(1) of the Diplomatic Relations Convention.

### DISCUSSION

I.    **EMPLOYMENT OF A DOMESTIC WORKER IS NOT "COMMERCIAL
      ACTIVITY" UNDER ARTICLE 31(1)(c) OF THE DIPLOMATIC RELATIONS
      CONVENTION**

When interpreting treaties, courts should be mindful that they are contracts between

foreign sovereigns, and as such, are to be interpreted in a way that gives effect to the intent of the

parties.  See De Geofroy v. Riggs, 133 U.S. 258, 271 (1890).  Accord Tabion v. Mufti, 877

F.Supp. 285, 287, aff'd, 73 F.3d 535 (4th Cir. 1996); Nielsen v. Johnson, 279 U.S. 47, 51 (1929).

"[B]ecause the signatories' intent is paramount, courts 'may look beyond the written words to the

history of the treaty, the negotiations, and the practical construction adopted by the parties.'"

Tabion, 877 F.Supp. at 287, citing Air France v. Saks, 470 U.S. 392, 397 (1985).

Article 31 is one of several articles of the Diplomatic Relations Convention that provide

special legal protection for diplomats.  As the preamble to the Diplomatic Relations Convention

makes clear, immunities are accorded "not to benefit individuals but to ensure the efficient

performance of the functions of diplomatic missions as representing States. . . ."  By necessity,

diplomats must carry out their work in a foreign – sometimes even hostile – environment.

Jurisdictional immunity ensures their ability to function effectively by insulating them from the

disruptions that would be associated with litigation in that environment.[2]  This protection was

_____

   [2] Diplomats remain subject to the jurisdiction of their own country.  Diplomatic
Relations Convention, Article 31(4).

regarded as so important that for almost two centuries the United States accorded diplomats complete immunity.  See 22 U.S.C. §§ 252-254 (statute in force from 1790 to 1978).  When the United States became a party to the Diplomatic Relations Convention, it recognized the small number of limited exceptions to diplomatic immunity provided for in the treaty.  One of those exceptions, enumerated in Article 31(1)(c), states that a diplomat's usual immunity from the civil and administrative jurisdiction of the receiving State shall not apply in the case of "an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official function."

In the view of the United States, the term "commercial activity" as used in Article 31(1)(c) focuses on the pursuit of trade or business activity unrelated to diplomatic work.  Such commercial activity is normally undertaken by a diplomat for profit or remuneration and, if undertaken by the diplomat himself (as opposed to family members), would be in contravention of Article 42, which provides that a "diplomatic agent shall not in the receiving State practice for personal profit any professional or commercial activity."  Indeed Article 31(1)(c) works in conjunction with Article 42 to make clear that, if a diplomat does engage in such an activity, he does not have immunity from related civil actions.  Conversely, the term "commercial activity" in Article 31(1)(c) does not encompass contractual relationships for goods and services incidental to the daily life of the diplomat and the diplomat's family in the receiving State.

This long-standing interpretation is entitled to great weight.  See Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85 (1982) ("the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.  Kolovrat v. Oregon, 366 U.S. 187, 194 (1961)").  Deference is particularly

appropriate in the case of the Diplomatic Relations Convention, which forms the framework of the Department of State's conduct of diplomatic relations with virtually every country in the world, and which the Department accordingly interprets and applies on a regular basis, taking into account not only the interests of the foreign states with diplomatic representation in the United States, but the interests of the United States in sending diplomats abroad. The interpretation of the Diplomatic Relations Convention in the United States may affect the treatment of United States diplomats and their family members serving in other countries, including in potentially hostile situations. The Convention's protections are to permit diplomats to reside and function in foreign countries free from harassment and litigation. The United States' interpretation of Article 31(1)(c) is not only consistent with the broad purposes the immunity is intended to serve, but is also supported by U.S. caselaw and the negotiating history of the Convention.

A.    **Caselaw supports the United States' interpretation of "commercial activity"**

In Tabion v. Mufti, 877 F.Supp. 285 (1995), *aff'd*, 73 F.3d 535 (4th Cir. 1996), a former domestic worker for a foreign diplomat sued the diplomat and his wife for, *inter alia*, failure to pay minimum wage and breach of their employment contract. See Tabion, 877 F.Supp. at 286-87. The defendants moved to quash, claiming immunity from civil suit under Article 31(1) of the Diplomatic Relations Convention. Id. at 287. Plaintiff opposed the motion, contending that her claim fell within the Article 31(1)(c) exception to civil immunity because her employment relationship with the defendants constituted "commercial activity." See id. Relying on both the negotiating history of the Diplomatic Relations Convention and the position proffered by the

United States,[3] the district court correctly held that the defendants were immune from suit because their employment relationship with the plaintiff was not "commercial activity." See id. at 292. The district court noted that the treaty's negotiating history "points persuasively to the conclusion that Article 31(1)(c) was not intended to carve out a broad exception to diplomatic immunity for a diplomat's daily contractual transactions for personal goods and services." Id. at 291. The district court also noted that the United States' position in the case – that the term "commercial activity" focuses on the pursuit of trade or business activity – was "significant" and "add[ed] substantial force" to the court's holding. See id. at 292.

Finding the district court's opinion "well-reasoned," the Fourth Circuit affirmed the lower court's holding, and concluded that:

> . . .the phrase "commercial activity," as it appears in the Article 31(1)(c) exception, was intended by the signatories to mean "commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." Day-to-day living services such as dry cleaning or domestic help were not meant to be treated as outside a diplomat's official functions. Because those services are incidental to daily life, diplomats are to be immune from disputes arising out of them.

Tabion, 73 F.3d at 538-39. See also Ahmed v. Hoque, 2002 WL 1964806.

### B.    The negotiating and drafting history of the Diplomatic Relations Convention supports the United States' interpretation of "commercial activity"

The United States' position on the interpretation of "commercial activity" is also supported by the negotiating and drafting history of the Diplomatic Relations Convention. See Tabion, 877 F.Supp. at 292. The Convention evolved from an initial draft developed by the

---

[3] The district court in Tabion invited the United States to submit a Statement of Interest discussing the proper interpretation of Article 31(1)(c). See Tabion, 877 F.Supp. at 292. The United States' position in the instant case is consistent with its position in Tabion.

United Nations International Law Commission (ILC), a body of international law experts, in a series of meetings. The ILC draft was then considered by states at a formal diplomatic conference convened by the United Nations in 1961. In both fora, it was clear that a diplomat would continue to enjoy immunity for contracts incidental to everyday life.

The ILC began its work in earnest by considering a draft for the Codification of the Law Relating to Diplomatic Intercourse and Immunities proposed by its Special Rapporteur in 1955. The draft contained no exception to immunity for commercial activity. See Report Presented by Mr. A.E.F. Sandstrom, Special Rapporteur, U.N. Doc. A/CN.4/91, [1955] 2 Y.B. Int'l L. Comm'n 16, U.N. Doc. A/CN.4/SER.A/1955/Add.1. An amendment providing an exception to immunity for acts "relating to a professional activity outside [the diplomatic agent's] official duties" was first introduced into the Draft Articles at the 402nd meeting of the ILC, during its Ninth Session, on May 22, 1957. Summary Records of the 402nd Meeting, [1957] 1 Y.B. Int'l L. Comm'n 97, U.N. Doc. A/CN.4/SER.A/1957. Mr. Verdross, the author of the proposed amendment, based his proposal on Article 13 of the 1929 resolution of the Institute of International Law, which referred only to "professional" activity. The proposed amendment was also described as being akin to Article 24, paragraph 2 of the 1932 Harvard Draft Convention on Diplomatic Privileges and Immunities (the "Harvard Draft"). The Harvard Draft referred to "business" as well as "professional" activity as follows:

> A receiving state may refuse to accord the privileges and immunities provided for in this convention to a member of a mission or to a member of his family who engages in a business or who practices a profession within its territory, other than that of the mission, with respect to acts done in connection with that other business or profession.

Summary Records of the 402nd Meeting, supra, at 97 (quoting Art. 24, para. 2 of the Harvard Draft). Mr. Verdross' proposed amendment was not intended to address ordinary contractual

relationships for goods and services incidental to daily life.  This is evidenced by Mr. Verdross'

reference to the Harvard Draft and his observation that the cases to which the amendment related

were "comparatively rare."  Id. at 97.  Several ILC members suggested that the proposal was

unnecessary because it aimed at activity in which diplomats rarely engaged.  Id. at 97-98.

As formulated in 1957, at the ILC's Ninth Session, the ILC's provisional draft eliminated

civil and administrative immunity for actions "relating to a professional or commercial activity

exercised by the diplomatic agent in the receiving State and outside his official functions."

Reports of the Commission to the General Assembly, U.N. Doc. A/3623, reprinted in [1957] 2

Y.B. Int'l L. Comm'n 139, U.N. Doc. A/CN.4/SER.A/1957/Add.1.  This provisional draft was

submitted to governments for comment.  See Diplomatic Intercourse and Immunities: Summary of

Observations Received from Governments and Conclusions of the Special Rapporteur, U.N.

Doc.A/CN.4/116.  The Australian member commented that the term "commercial activity"

required some definition.  The Special Rapporteur explained that "the use of the words

'commercial activity' as part of the phrase 'a professional or commercial activity' indicates that it

is not a single act of commerce which is meant, by [sic] a continuous activity."[4]  Id. at 56.  When

_____

[4]    Denza, a leading authority, described the Diplomatic Relations Convention's use of "commercial activity" in these terms:

It is clear that the ideas of remuneration (emphasis added) and of a continuous activity are central to the purpose of Article 31(1)(c).  Although the provision is drafted in unnecessarily wide terms it is not intended to cover commercial contracts incidental to the ordinary conduct of life in the receiving State.  If one accepts that Article 31(1)(c) is to be interpreted in this sense it becomes clear that whereas the speculative activities of a diplomat on the Stock Exchange would come within the exception to immunity, contracts of personal loan would not, nor would contracts entered into for the purpose of educating the children of a diplomatic agent or otherwise supplying him and his family with any kind of good or services.

9

the United States' member commented that the commercial activity exception went beyond existing international law, the Special Rapporteur responded by describing the exception in terms of activity that was <u>inconsistent</u> with diplomatic status. He commented as follows:

> In case (c), the considerations were as follows. A condition of the exercise of a liberal profession or commercial activity must be that the client should be able to obtain a settlement of disputes arising out of the professional or commercial activities conducted in the country. It would be quite improper if a diplomatic agent, <u>ignoring the restraints which his status ought to have imposed upon him</u>, could, by claiming immunity, force the client to go abroad in order to have the case settled by a foreign court.

<u>Id.</u> at 55-56 (emphasis added).

At its Tenth Session in 1958, the ILC adopted a final draft convention that contained a commercial activity exception to civil and administrative immunity. As the records from this session show, the Rapporteur and ILC's Chairman viewed the commercial activity exception as focusing on the pursuit of private trade or business activity. They responded to a member's comment that he had understood the commercial activity exception to cover even isolated commercial transactions as follows:

> Sir Gerald FITZ MAURICE, Rapporteur, doubted the advisability of Mr. Zourek's suggestion. Paragraph 1(c) of the article applied to cases where a diplomatic agent conducted a regular course of business 'on the side.' Such isolated transactions as, for instance, buying or selling a picture, were precisely typical of the transactions not subject to the civil jurisdiction of the receiving State. Annoying as it might be for the other parties to such transactions in the event of a dispute, it was essential not to except such transactions from the general rule for, once any breach was made in the principle, the door would be open to a gradual whittling away of the diplomatic agent's immunities from jurisdiction.
>
> The CHAIRMAN pointed out that the article referred to 'commercial activity.' A single transaction would hardly constitute 'commercial activity.' Of course, even a single plunge

---

Denza, <u>Diplomatic Law</u>, 166-67 (1st ed. 1976) (emphasis in original). Indeed, Denza quotes the decision of the Fourth Circuit in <u>Tabion</u> as correctly describing the scope of Article 31(1)(c). <u>See</u> Denza, <u>Diplomatic Law</u>, 250-251 (2d ed. 1998).

in the waters of trade might suffice, but it must be in the waters of trade.

Summary Records of the 476th Meeting, [1958] 1 Y.B. Int'l L. Comm'n 244 U.N. Doc.

A/CN.4/SER.A/1958.  The ILC's Commentary on this provision, as adopted in 1958, also shows

that the term "commercial activity" did not encompass the usual procurement of goods and

services needed in the diplomat's daily life, but rather focused on activities that were normally

inconsistent with a diplomat's position.  The commercial activity exception was explained as

follows:

> The third exception arises in the case of proceedings relating to a professional or
> commercial activity exercised by the diplomatic agent outside his official functions.  It was
> urged that activities of these kinds are normally wholly inconsistent with the position of a
> diplomatic agent, and that one possible consequence of his engaging in them might be that
> he would be declared persona non grata.  Nevertheless, such cases may occur and should
> be provided for, and if they do occur the persons with whom the diplomatic agent has had
> commercial or professional relations cannot be deprived of their ordinary remedies.

Report of the Commission to the General Assembly, U.N. Doc. A/3859, reprinted in [1958] 2

Y.B. Int'l L. Comm'n 98, U.N. Doc. A/CN.4/SER.A/1958/Add.1.

The ILC's draft convention was considered at the United Nations Conference on

Diplomatic Intercourse and Immunities in 1961.  The Department of State's instructions to the

United States delegation at that Conference expressed the following understanding of the

commercial activity exception:

> Although states have generally accorded complete immunity to diplomatic agents from
> criminal jurisdiction, there has been a reluctance in some countries to accord complete
> immunity from civil jurisdiction particularly where diplomats engage in commercial or
> professional activities which are unrelated to their official functions.  While American
> diplomatic officers are forbidden to engage in such activities in the country of their
> assignment, other states have not all been so inclined to restrict the activities of their
> diplomatic agents.  Subparagraph c) of paragraph 1 would enable persons in the receiving
> State who have professional and business dealings of a non-diplomatic character with a
> diplomatic agent to have the same recourse against him in the courts as they would have
> against a non-diplomatic person engaging in similar activities.

11

7 Digest of Int'l Law 406 (Whiteman 1970) (emphasis added).

        The United States' view – that the commercial activity exception in Article 31(1)(c)

focused on the kind of activity for profit in which diplomats should not be engaging – was borne

out in the treatment of the issue at the Conference.  Commercial activity was considered in the

context of a new article proposed by the delegate from Colombia, which is now Article 42 of the

Diplomatic Relations Convention.  Article 42 provides that "[a] diplomatic agent shall not in the

receiving State practice for personal profit any professional or commercial activity."  The

delegates' discussion of Colombia's proposed amendment shows that the delegates envisioned

Article 42 as addressing only the pursuit of active trade or business activity.  See e.g., the

statements of the representatives of Ceylon ("the supporters of the proposed new article had in

mind a regular professional activity from which a permanent income was derived, and not an

occasional activity, particularly of a cultural character"); Italy (favoring the proposal "provided

that it was made clear . . . that the intention was to prevent diplomats from engaging in gainful

activities such as commerce, industry or a regular profession"); Malaya (the proposal "should be

limited to commercial activity for personal profit").  United Nations Conference on Diplomatic

Intercourse and Immunities: Official Records, Vol. I at 212-13 (1962), U.N. Doc. A. CONF.20/14.

        The Conference delegates saw the commercial activity exception contained in Article

31(1)(c) and the ban on commercial activity contained in Article 42 as closely intertwined.

Indeed, the delegates from Colombia and Italy proposed deletion of the commercial activity

exception in Article 31(1)(c) as unnecessary in view of the prohibition in Article 42.  The

Conference voted, however, to retain the exception following discussion in plenary session in

which several delegates pointed out that there could be no assurance that diplomatic agents would

12

not engage in prohibited activities, and, in any event, the prohibition did not apply to their family members who would otherwise enjoy immunity for such activities.  See United Nations Conference on Diplomatic Intercourse and Immunities: Official Records, supra at 19-21; United Nations Conference on Diplomatic Intercourse and Immunities: Report of the Delegation of the United States of America, reprinted in Vienna Convention on Diplomatic Relations, together with the Optional Protocol Concerning the Compulsory Settlement of Disputes, Executive H, 88th Cong., 1st Sess. at 58.[5]  All other proposals to provide additional exceptions to immunity for claims for damages caused by a diplomatic agent were rejected.  Report of the Delegations of the United States of America, supra, at 49.[6]

---

[5]        Numerous commentators have discussed the commercial activity exception of Article 31(1)(c) in terms that indicate that the scope of the phrase "professional or commercial activity" parallels the prohibition on a diplomat's engaging in private professional and commercial activity that is prohibited in Article 42.  See, e.g., Murty, The International Law of Diplomacy: the Diplomatic Instrument and World Public Order 356 (1989) ("'Professional or commercial' activity should be interpreted alike in Art. 31(1) and Art. 42"); McClanahan, Diplomatic Immunity 130-31 (1989) (although Art. 42 bars diplomats from engaging in commercial or professional activity, Art. 31(1)(c) "covers the few cases where a diplomat's own government and the receiving state waive objections"); Dembinski, The Modern Law of Diplomacy 207 (1988) (professional and commercial activity by diplomats is prohibited and the exception is only to make clear that there is no immunity); Brown, Diplomatic Immunity:  State Practice under the Vienna Convention on Diplomatic Relations, 37 Int'l & Comp. L. Q. 53, 76 (1988) (relating "commercial activity" to the activities barred by Art.42); Satow's Guide to Diplomatic Practice, 126-27 (Fifth Edition 1979) (noting that the exception of Art. 31(1)(c) had little meaning for diplomats themselves but has more meaning for family members who may be employed); Cahier and Lee, Vienna Conventions on Diplomatic and Consular Relations 29 (1969) (Art. 31(1) probably "redundant" because Art. 42 "forbids the diplomatic agent from engaging in such activities"); Hardy, Modern Diplomatic Law 62 (1968) (discussing Art. 31(1)(c) with reference to Art. 42); cf. also Restatement (Third) of the Foreign Relations Law of the United States, § 464, Reporters' Note 9 at 468 (1987).

[6]  It is immaterial that Article 31(1)(c) does not contain the phrase "for profit," because it is clear from the negotiating history that the drafters understood it in that light.  Treaties are to be interpreted in good faith to fulfill the intent of the parties.  See e.g. DeGeofroy v. Riggs, 133 U.S. 258, 271 (1890).

In sum, diplomats are engaged in "professional or commercial" activity within the meaning of the Diplomatic Relations Convention when they engage in a business, trade or profession for profit. When diplomats enter into contractual relationships for personal goods or services incidental to residing in the host country, including the employment of domestic workers, they are not engaging in "commercial activity" as that term is used in the Diplomatic Relations Convention. Accordingly, diplomats are immune from suits arising out of such contractual relationships.

     **C.**     **Directives contained in circular diplomatic notes issued by the Department of State do not change the meaning of "commercial activity" in Article 31 of the Diplomatic Relations Convention or reflect a change in the United States' interpretation of that term**

The Department of State's requirement, reflected in circular diplomatic notes,[7] that diplomats enter into employment contracts with their domestic workers, does not – indeed could not – change the meaning of the Diplomatic Relations Convention, including the fact that these contracts do not constitute "commercial activity." Rather, this requirement is an effort to ensure advance understanding of the terms of employment at the outset so that disputes will be avoided.[8]

---

[7] In a circular diplomatic note dated May 20, 1996, the Department of State "strongly encouraged" such contracts. United States Department of State, Circular Diplomatic Note of May 20, 1996 at 2, *available at: http://www.state.gov/documents/organization/32298.pdf* . In a more recent circular diplomatic note, dated June 19, 2000, the Department of State announced that it now requires "every prospective employer [...] to offer a written contract of employment to the domestic employee. . . ." United States Department of State, Circular Diplomatic Note of June 19, 2000 at 1, *available at: http://www.state.gov/documents/organization/32298.pdf* .

[8] There may be instances in which an employer subject to this contract requirement does not have the immunities applicable in this case. The contract requirement applies to workers who are recipients of A3 and G5 visas. Some will work for full diplomats (diplomatic agents) and their family members, who are in the relatively unusual position of having broad civil immunities under the Diplomatic Relations Convention. Others may be employed by other members of an embassy's staff, such as administrative and technical staff, who have civil

In fact, it is clear from the notes themselves that the Department of State did not intend to strip diplomats of their immunity.  In the May 20, 1996 circular diplomatic note, the Secretary of State requested that the missions of foreign governments:

> . . . remind its members that the Vienna Convention on Diplomatic Relations, Article 41, para.1 [. . . ] provide[s] that "[w]ithout prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving State," including, for example, fair labor laws.

United States Department of State, Circular Diplomatic Note of May 20, 1996, at p. 4 (emphasis added).  An enclosure to the 1996 note, suggesting appropriate terms of contracts, also reflected that the requested contract was without prejudice to the diplomats' immunities.  Id.  In addition, the 1996 circular diplomatic note advised the missions that, in cases where domestic workers have alleged abuse by diplomatic agents, "the Department will bring the allegations to the attention of the mission and take such other action as may be appropriate, which could include a request for a waiver of any applicable immunity."[9]  United States Department of State, Circular Diplomatic Note of May 20, 1996 at p.4 (emphasis added).  And, the circular diplomatic note of June 19, 2000, attached the 1996 note as well as its enclosure reflecting that the contracts were without prejudice to immunities.  Furthermore, any attempt by the United States to abrogate diplomatic immunity through the requirement of such contracts would be an extraordinary departure by the

---

immunities only for acts performed in their official capacities.  See Diplomatic Relations Convention, Article 37.  Still others may be employed by consular personnel serving at consulates outside capitals rather than at embassies.  The immunities of personnel at consulates are typically governed by the Vienna Convention on Consular Relations, done April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, entered into force for the United States December 24, 1969 ("Consular Convention"), and Article 41 of the Consular Convention provides immunities only for "acts performed in the exercise of consular functions."  (See Park v. Shin below.)

[9]  Pursuant to Article 32 of the Diplomatic Relations Convention, any waiver by the sending State must be express.

United States from its long-standing interpretation of the Diplomatic Relations Convention that to our knowledge is uniformly shared by all other parties.

> **D.     PURSUIT OF ACADEMIC STUDIES IS NOT "PROFESSIONAL ACTIVITY" UNDER ARTICLE 31(1)(c) OF THE DIPLOMATIC RELATIONS CONVENTION**

In the United States' view, the term "professional activity" as used in Article 31(1)(c) focuses on the active participation in professional employment for remuneration; it does not include the pursuit of academic studies. This interpretation is supported by the negotiating history of Article 31, and is reflected in long-standing international practice.

The early discussions of this provision during the Diplomatic Relations Convention's negotiations suggests that the drafters viewed Article 31(1)(c) as referring to the active practice of a profession. As discussed above, <u>see</u> Section I. B. <u>supra</u>, Mr. Verdross' initial proposal of the professional activity exception was akin to the Harvard Draft. <u>See</u> <u>Summary Records of the 402nd Meeting</u>, <u>supra</u>, at 97. Mr. Verdross' proposed amendment was not intended to include the pursuit of academic studies. This is evidenced by Mr. Verdross' reference to the Harvard Draft, which denied immunity for a diplomat who "<u>practices</u> a profession other than that of the mission . . . ." <u>Id.</u> at 97 (emphasis added). Moreover, it is clear from the ILC discussion that the ILC members intended to address the active practice of a profession. For example, in suggesting that the proposal was unnecessary, one member stated that "[t]o <u>engage</u> in a professional activity outside his official duties would impair the dignity not merely of the diplomatic agent himself but of the whole mission." <u>Id.</u> at 98 (emphasis added). In closing the discussion, it was agreed, in principle, that the article would eliminate immunity if a diplomat engaged in a professional activity. <u>Id.</u>

As discussed above, see Section I. B. supra, representatives of states who attended the United Nations Conference on Diplomatic Intercourse and Immunities discussed the "professional activity" exception in Article 31 in light of the prohibition on that activity contained in Article 42. The discussion shows that the delegates envisioned Article 42 as addressing the active practice of a profession. For example, the representative from Ecuador noted that "diplomatic functions were obviously incompatible with the exercise of an outside gainful occupation." United Nations Conference on Diplomatic Intercourse and Immunities: Official Records, supra, at 212. In addition, the representative from Italy made clear that the intention of the proposed amendment was to prevent diplomats from "engaging in gainful activities such as commerce, industry or a regular profession." Id. at 213. The representative from Ceylon understood the supporters of the proposed amendment to mean "a regular professional activity from which a permanent income was derived, and not an occasional activity, particularly of a cultural nature." See id. at 212.

The United States' position that "professional activity" does not include the pursuit of academic studies is also reflected in long-standing international practice, which takes contrasting approaches to the treatment of diplomatic family members who are students and those who work. Many diplomatic family members pursue academic – including professional – degrees while they are posted in the United States. Family members of United States diplomats assigned abroad similarly engage in academic pursuits in their countries of assignment. In both cases it is understood that studying is not a professional or commercial activity, and no special steps are taken to govern this activity or to address any issues relating to immunity that might arise from it. In contrast, when diplomatic family members work (other than for their own government), that activity is considered "professional or commercial." As a result, specific arrangements are made,

17

including in some instances formal "dependent employment agreements," that permit diplomatic family members to engage in employment and specifically discuss the attendant consequences for their immunities when they do so.[10]

Even if studying in a professional or technical area were a "professional" activity, employing a person for childcare would not be within the exception to immunity. To take the view that studying is a "professional or commercial" activity and then, additionally, to treat any activity that is possibly incidental to studying as "related to" a "professional or commercial" activity would be at odds with the Convention. Such an interpretation would defeat the Convention's goal of facilitating the ability of states to conduct diplomatic relations by permanently posting diplomats and their families abroad. Moreover, it would substantially undercut the civil immunity of diplomats, opening up a significant exposure to litigation and apparently requiring diplomats to explain their reasons for particular purchases to courts so that courts could decide whether the diplomat was immune or not.

The effect of such an approach on diplomatic living conditions and morale would be profoundly negative, as it could ultimately result in sending States barring their diplomatic family members from engaging in academic pursuits so as to avoid becoming embroiled in domestic litigation. On a reciprocal basis, the effect of such an interpretation could deprive United States diplomatic dependents of immunities for a broad array of activities related, however remotely, to

---

[10] The United States and Argentina have such an employment agreement, which states that family members of diplomatic agents may "accept employment" in the receiving State. The agreement further explains that, with respect to family members who have immunity from the jurisdiction of the receiving state in accordance with Article 31 of the Diplomatic Relations Convention, "immunity from civil and administrative jurisdiction with respect to all matters arising out of such employment is hereby irrevocably waived by the sending state concerned." T.I.A.S. No. 11414, 1986 WL 223663.

educational activities abroad, or even ultimately relating merely to ordinary living expenses. This would be a matter of substantial concern to the United States, as the ability of diplomatic family members – including not only spouses but children as well – to study while posted abroad is important for its own Foreign Service.

## II. THE CASELAW INTERPRETING "COMMERCIAL ACTIVITY" UNDER THE FSIA SHOULD NOT BE USED AS AN INTERPRETIVE GUIDE FOR THE SAME PHRASE IN THE DIPLOMATIC RELATIONS CONVENTION

The caselaw interpreting "commercial activity" under the FSIA is not instructive with respect to interpreting "commercial activity" under the Diplomatic Relations Convention. This is true for several reasons. Diplomatic immunity and sovereign immunity are different doctrines with different histories in the United States. As such, the Diplomatic Relations Convention and the FSIA have different standards for what constitutes commercial activities. They serve different functions and different considerations drive their interpretation. There is no reason to construe them in the same way – indeed, it would be wrong to do so. As described above, see Section I supra, for almost two centuries, until it became a party to the Diplomatic Relations Convention in 1972, the United States afforded complete immunities to foreign diplomats. See 22 U.S.C. §§ 252-254 (repealed). By joining the Diplomatic Relations Convention, the United States for the first time recognized the small number of limited exceptions to a diplomat's immunity set forth in Article 31.

Sovereign immunity has gone through three phases. Until 1952, the United States recognized virtually absolute immunity of foreign sovereigns, and courts dismissed cases following a certification of immunity by the Executive. See Turkmani v. Republic of Bolivia, 193 F.Supp.2d 165, 170, citing Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480 (1983).

19

From 1952 until 1976, the Executive recognized the "restrictive theory" of sovereign immunity, under which foreign governments could be subject to jurisdiction for private activities but continued to certify immunity for sovereign actions.  See Verlinden B.V. 461 U.S. at 486-87.  In 1976, the Foreign Sovereign Immunities Act codified the restrictive theory of sovereign immunity and transferred from the Executive to the courts the decision-making authority concerning immunity.  See id. at 488.

As its preamble makes clear, and as discussed above, see Section I supra, the purpose of the Diplomatic Relations Convention, which was adopted fifteen years before the FSIA became law, is to grant immunity to diplomatic agents and their families in order to "ensure the efficient performance of the functions of diplomatic missions as representing States. . . ."  The Diplomatic Relations Convention is intended to confer a broad immunity from civil jurisdiction to protect diplomats and eliminates civil immunity in only three narrow circumstances.  The actual conduct of diplomacy would be seriously hindered if sending States could not send their diplomats to reside in receiving States without minimal risk that the diplomat would become subject to the jurisdiction of the receiving State's courts.  Thus, the negotiating history of Article 31(1)(c) of the Convention reveals that the term "commercial activity" in Article 31 was intended to create a narrow exception to immunity.  As explained above, it refers to ongoing conduct of a commercial enterprise, i.e., the conduct of a business or employment by a diplomat or family member.  "The ideas of remuneration (emphasis added) and of a continuous activity are central to the purpose of Article 31(1)(c)."  Denza, Diplomatic Law, 166 (1st ed. 1976) (emphasis in original).

The purpose of the FSIA, on the other hand, was to codify the restrictive principle of sovereign immunity.  See Verlinden B.V., 461 U.S. at 488.  See also Southway v. Central Bank of

Nigeria, 198 F.3d 1210, 1216 (10th Cir. 1999) (the purpose of the FSIA was to "restrict the

sovereign immunity of foreign states 'to cases involving acts of a foreign state which are

sovereign or governmental in nature, as opposed to acts which are either commercial in nature or

those which private persons normally perform'").  A very different set of considerations comes

into play when a sovereign state engages in commercial activity than when it sends its diplomats

to another state to reside and conduct diplomatic discourse on the sending State's behalf.  Thus, it

is not surprising that, consistent with the statutory definition of "commercial activity," 28 U.S.C.

§ 1602, courts have held that a contractual arrangement constitutes commercial activity and may

give rise to jurisdiction.  See e.g., Janini v. Kuwait University, 43 F.3d 1534, 1537 (D.C. Cir.

1995) (Kuwait University's unilateral termination of employees' contracts was "commercial

activity" under the FSIA).

        The difference between the diplomat assigned abroad to conduct diplomacy and the

sovereign state engaging in commercial activity was explicitly recognized by Congress in

connection with enacting the FSIA.  The legislative history of the FSIA expressly states that the

statute is not intended to affect the immunities of diplomats.  H.R. Rep. No. 1487, 94th Cong. 2d

Sess. 16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6610.  See also n.5 supra.  Moreover, the

FSIA itself states that sovereign immunity under the Act is "[s]ubject to existing international

agreements to which the United States is a party at the time of the enactment of this Act" – such

preexisting agreements of course include the Diplomatic Relations Convention.  28 U.S.C. §

1604.  See also Liberian Eastern Timber Corp. v. Republic of Liberia, 659 F.Supp. 606, 608 n.3

(D.D.C. 1987) (stating that "Congress did not intend the FSIA to affect diplomatic immunity

under the Vienna Convention"); Lafontant v. Aristide, 844 F.Supp. 128, 137 (E.D.N.Y 1994)

(FSIA enacted primarily to allow State-owned companies to be sued in United States and left "traditional head-of-state and diplomatic immunities untouched").

Since enactment of the FSIA, the distinction between the "commercial" exception in the Diplomatic Relations Convention and the "commercial" exception in the FSIA has also been the subject of explicit Executive-Legislative dialogue. In a Congressional hearing on diplomatic privileges and immunities in 1988, the Department of State submitted a formal response for the record expressing its position on the limited scope of commercial activity, and by comparison, stated that:

> . . . the exception to diplomatic immunity contained in Article 31(1)(c) is narrower than the exception to sovereign immunity contained in the FSIA. (The FSIA defines a commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. 1603(d).)

The Diplomatic Privileges and Immunities Act: Hearing before the Subcomm. on International Operations of the House Comm. on Foreign Affairs, 100th Cong. 2d Sess. 268-69 (1988).

Park v. Shin, 313 F.3d 1138 (9th Cir. 2002) does not support a contrary view. In Park, the defendant, a deputy consul at a consulate in California, argued that he was immune from employment-related claims alleged by the plaintiff, his former domestic worker. See id. The defendant argued that he had immunities from two sources: the Vienna Convention on Consular Relations and the FSIA, with immunity under the latter arising under caselaw in the Ninth Circuit. See id. at 1141. The Ninth Circuit first concluded that the defendant did not have immunity under the Consular Convention, which extends immunities to consular personnel only for "acts performed in the exercise of consular functions" See id. (referring to Article 43 of the Consular Convention). In so holding, the Ninth Circuit properly recognized that Tabion and the Diplomatic Relations Convention, which Tabion applied, did not pertain to the consular officer defendant.

See id. at 1142 n.1.  After concluding that the defendant was not immune under the Consular Convention, the Ninth Circuit went on to consider whether, under its caselaw holding that the FSIA accords immunity to foreign government officials in some circumstances, the consular officer defendant had the immunity of the sovereign.  See id. at 1142-46.  The court concluded that no FSIA immunity was available because, under the FSIA, the activity in question was "commercial."  That conclusion is irrelevant, however, as recognized by the Ninth Circuit, to the immunities that apply to a diplomatic agent under the Diplomatic Relations Convention.  See id. at 1144-45.

Finally, the rules that may apply to statutory construction should not be applied to treaty interpretation.  Treaties are contracts between foreign sovereigns, and their primary purpose is to establish reciprocal international legal obligations among the signatory nations.  De Geofroy v. Riggs, 133 U.S. 258, 271 (1890).  Accord Tabion, 877 F.Supp. at 287.  Treaties must be construed "so as to carry out the apparent intention of the parties to secure equality and reciprocity between them."  DeGeofroy, 133 U.S. at 271.  There is no basis in these principles to think that the Diplomatic Relations Convention – a multilateral treaty with 185 signatories – should be interpreted by "borrowing" the meaning of "commercial activity" from a domestic statute – the FSIA – enacted unilaterally by the United States over fifteen years after the Convention was adopted.  While "borrowing" may be appropriate in some circumstances, such as where two statutes of the same legislative body use the same language and there is reason to think common construction was intended, there is no basis for "borrowing" in this case.  See Nielsen v. Johnson, 279 U.S. 47, 51 (1929); Tabion, 877 F.Supp. at 289.

23

## CONCLUSION

For the foregoing reasons, the term "commercial activity" as used in Article 31(1)(c) of the Diplomatic Relations Convention should be interpreted as focusing on the pursuit of trade or business activity; it should not include contractual relationships for goods and services incidental to the daily life of the diplomat and his family in the receiving State.  Similarly, the term "professional activity" under Article 31(1)(c) should be interpreted as focusing on the active participation in professional employment for remuneration; it should not include the pursuit of academic studies.  Finally, the caselaw interpreting the term "commercial activity" under the FSIA should not be used to interpret the same term under the Diplomatic Relations Convention.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch


s/ Siobhan K. Madison
SIOBHAN K. MADISON
Trial Attorney
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., N.W.
Washington, D.C. 20530
(202) 353-2646 (tel)
(202) 616-8740 (fax)

*Counsel for the United States of America*

24