IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

LUCIA MABEL GONZALEZ PAREDES, )
)
Plaintiff )
)
v. ) Case No. 1:06CV00089 P.L.F.
)
JOSE LUIS VILA and MONICA NIELSEN, )
)
Defendants )
)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO
QUASH SERVICE OF PROCESS AND DISMISS COMPLAINT

**TABLE OF AUTHORITIES**

**CASES**

**Page(s)**

Arlington Central School District Board of Education v. Murphy, 126 S. Ct. 2455 (2006) ....... 18

Carrera v. Carrera, 174 F.2d 496 (D.C. Cir. 1949) ....... 7

Eastern Airlines, Inc. v. Floyd, 499 U.S. 530 (1991) ....... 10

El-Hadad v. Embassy of the United Arab Emirates, 69 F. Supp.2d 69 (D.D.C. 1999) ....... 14, 15

Goodman Holdings v. Rafidain Bank, 26 F.3d 1143 (D.C. Cir. 1994) ....... 12

Hamdan v. Rumsfeld, 126 S. Ct. 2749 (2006) ....... 18

Harris v. Ladner, 127 F.3d 1121 (D.C. Cir. 1997) ....... 4

Ignatiev v. United States, 238 F.3d 464 (D.C. Cir. 2001) ....... 12

Janini v. Kuwait University, 43 F.3d 1534 (D.C. Cir. 1995) ....... 15

*Jungquist v. Nahyan, 940 F. Supp. 312 (D.D.C. 1996) ....... 7

Logan v. Dupuis, 990 F. Supp. 26 (D.D.C. 1997) ....... 19

Millicom International Cellular v. Costa Rica, No. Civ. A. 96-315 (RMU), 1997 WL 527340 (D.D.C. Aug. 18, 1997) ....... 12

*Park v. Shin, 313 F.3d 1138 (9th Cir. 2002) ....... 15, 16, 20, 21, 22

Argentina v. Weltover, Inc., 504 U.S. 607 (1992) ....... 13, 14

Saudi Arabia v. Nelson, 507 U.S. 349 (1993) ....... 13

Tabion v. Mufti, 73 F.3d 535 (4th Cir. 1996) ....... 14, 16, 17, 18, 20, 21

United States v. Al-Hamdi, 356 F.3d 564 (4th Cir. 2004) ....... 6, 23

United States v. Lumumba, 741 F.2d 12 (2d Cir. 1984) ....... 7

United States v. Noriega, 746 F. Supp. 1506 (S.D. Fla. 1990) ....... 6

## STATUTES

28 U.S.C. §§ 1602 *et. seq*....................13

28 U.S.C. § 1603(d)....................13

29 C.F.R. § 791.2(a)....................9

## BOOKS AND TREATISES

American Heritage Dictionary 1446 (3d ed. 1996)....................11

Denza, Eileen Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations 251 (1976)....................9

*Restatement (Third) of Foreign Relations Law of the United States § 464 (1986)....................7

## MISCELLANEOUS

*9 FAM 41.21 N. 6.2(a), available at: http://foia.state.gov//masterdocs/09fam/0941021N.pdf....................26

United States Department of State, Non-Immigrant Visas Issued by Classification, available at: http://travel.state.gov/pdf/FY05tableXVIb.pdf....................4

*United States Department of State, Circular Diplomatic Note of May 20, 1996, available at: http://www.state.gov/documents/organization/32298.pdf....................23, 24, 28, 29

*United States Department of State, Circular Diplomatic Note of June 19, 2000, available at: http://www.state.gov/documents/organization/32298.pdf....................25

Vienna Convention on Consular Relations, 21 U.S.T. 77 (Apr. 24, 1963)....................20

Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227 (Apr. 18, 1961)..2, 8, 17, 22, 26, 27

Plaintiff Lucia Mabel Gonzalez Paredes (Ms. Gonzalez) respectfully submits this Opposition to "Defendants' Motion to Quash Service and Dismiss Complaint." (filed June 18, 2006) (hereinafter, "Defendants' Motion to Dismiss")

PRELIMINARY STATEMENT

As set forth in the Complaint. and discussed below, Ms. Gonzalez is a domestic worker from Paraguay who until recently was employed in the United States by Defendants Jose Luis Vila and Monica Nielsen. Defendant Vila is an Argentine diplomat posted in the United States. Defendant Nielsen is Mr. Vila's spouse; she is not a diplomat and is, Plaintiff believes, not employed in the United States. The Defendants hired Ms. Gonzalez for the express purpose of allowing Ms. Nielsen to attend law school while she was in the United States, and while Mr. Vila was working at the Argentine embassy. Defendants contracted in writing to employ Ms. Gonzalez for 40-hour weeks, at the rate of $6.72 per hour; but in fact, they forced her to work 77-hour weeks, and paid her approximately $1.60 per hour. In this action, Ms. Gonzalez seeks relief for violations of federal and local employment laws and for breach of contract.

After filing three motions for extensions of time to file an answer based on representations that they were seeking a waiver of diplomatic immunity, Defendants moved instead to quash service of process and to dismiss the Complaint. based on the assertion that they have diplomatic immunity under the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502 (hereinafter the "Vienna Convention" or the "Convention"). Motion to Dismiss at 1. Defendants' two-page motion, which is wholly unsupported by any affidavits or documentary evidence, consists of nothing more than their counsel's bare assertion that Defendants are diplomats with immunity under the Vienna Convention, and that none of the Convention's recognized exceptions to immunity should apply to them.

Defendants' motion is fatally flawed and should be denied for three separate and independent reasons.

*First*, Defendants have presented absolutely no evidence to support their claims of immunity. They offer nothing from themselves, nor from the Argentine embassy or the Argentine government, that would support their lawyer's assertion of immunity. The bare unsupported statements of Defendants' counsel are no substitute for evidence and are legally insufficient to support an assertion of diplomatic immunity.

*Second*, even if Defendants had established that they are diplomats entitled to protection under the Convention -- which they have entirely failed to do -- the facts asserted in the Complaint. (which must be taken as true for present purposes) are sufficient to defeat their claim of immunity under recognized exceptions to immunity specified in the Convention. Ms. Gonzalez was not employed by the Argentine embassy and did not do anything to further the work of the embassy or the Argentine government. Rather, she was employed as a domestic helper in Defendants' home and purely as a convenience to the Defendants. Under Article 31(1)(c) of the Convention, Defendants' claims of immunity must therefore fail, because their employment relationship with Ms. Gonzalez was simply a "commercial activity exercised … outside [Mr. Vila's] official functions." Moreover, the specific and principal purpose of Ms. Gonzalez's employment was to enable Ms. Nielsen to do something wholly unconnected with Mr. Vila's work as a diplomat -- namely, to free Ms. Nielsen from housekeeping and childcare duties so that she could obtain an advanced degree in legal studies and thereby further her professional career as a lawyer. Under the Convention, there is no immunity from liability for conduct "relat[ed] to [] professional … activity exercised … outside [the diplomat's] official

functions." That exception applies here, where the purpose of the employment relationship was to further Ms. Nielsen's career as a lawyer, rather than to serve any diplomatic function.

*Third*, even if the Convention applied and even if none of its exceptions were relevant, Defendants' claims of immunity should still be rejected because, in gaining entrance to the United States, the Defendants committed intentional fraud upon both the Plaintiff and the United States. Before obtaining entry, and hence immunity, they presented to the United States State Department a written employment contract with Ms. Gonzalez and represented to the United States Government that they would honor that contract. In fact, Defendants had no intention of honoring the contract, and their representations to the United States were false. Having gained admission to this country, and thus their status under the Convention, based on the representation that they would honor her work contract, Defendants should not now be permitted to renounce that contract and cheat her out of the protections to which she is entitled under the laws of the United States.

## I. STATEMENT OF FACTS

The relevant facts are set forth in the Complaint. and are as follows:[1]

While living in Argentina, Ms. Gonzalez became acquainted with Mr. Vila and Ms. Nielsen, who were planning to move to the United States so that Mr. Vila could take up his post at the Argentine embassy in Washington, D.C. Compl. ¶¶ 6-7. Ms. Nielsen, who was a lawyer in Argentina, was not a diplomat and was apparently not permitted to work in the United States. Defendants told Ms. Gonzalez that they were expecting a baby, and that they wished to hire her

[1] For present purposes, all of the allegations of the Complaint. must be accepted as true, and all inferences should be drawn in Ms. Gonzalez's favor. Harris v. Ladner, 127 F.3d 1121, 1123 (D.C. Cir. 1997).

so that Ms. Nielsen could pursue further legal studies in the United States. Id. ¶ 8. Defendants hired Ms. Gonzalez to accompany them to the United States. Her job was to do housework and to take care of the baby while Ms. Nielsen attended law school. Id. ¶¶ 6, 8.

Ms. Gonzalez and Mr. Vila signed an employment contract in connection with the requirements of her application for an A-3 visa, which would allow her to accompany Defendants to the United States as their personal employee. Id. ¶ 9.[2] On its face, the contract stated that it would be governed by the laws of the United States, and that Ms. Gonzalez would be paid a wage ($6.72 per hour) that exceeded the minimum applicable in the United States. Id. ¶ 13. However, soon after the parties signed the contract, Mr. Vila informed Ms. Gonzalez that Defendants had no intention of abiding by the contract. Id. Despite this, Mr. Vila instructed Ms. Gonzalez to tell the U.S. Embassy employees, who were interviewing her in Argentina in connection with her efforts to get an A-3 visa for entry into the United States, that she would in fact be making the wage set forth in the written contract. Id. Moreover, Mr. Vila himself took the only copy of the written contract from Ms. Gonzalez and submitted the contract to the U.S. Embassy in Argentina in an effort to ensure that Ms. Gonzalez was given the requisite visa. Id. ¶ 10.[3] The purpose of Mr. Vila's instructions to Ms. Gonzalez, and his showing the employment

---

[2] Ms. Gonzalez applied for and should have been given an A-3 visa. However, her passport was mistakenly stamped with a G-5 visa, instead of an A-3 visa. A-3 visas are for attendants, servants and employees of A-1 or A-2 visa holders, such as Defendants. See United States Department of State, Nonimmigrant Visas Issued by Classification, available at: http://travel.state.gov/pdf/FY05tableXVIb.pdf. By contrast, G-5 visas are for attendants, servants and personal employees of holders of G-1, G-2, G-3 and G-4 visas. Id. Mr. Vila brought the mistake to Ms. Gonzalez's attention. The Argentine embassy in the United States was in the process of correcting this mistake when Ms. Gonzalez's employment with the Defendants ended.

[3] Ms. Gonzalez later requested a copy of that contract, but Mr. Vila refused to give her one, stating that she had no need for it. Id. ¶ 29. Ultimately, she obtained a copy from the Argentine embassy.

contract to the U.S. Embassy, was to demonstrate that there was a written employment contract that complied with U.S. law and to give the false impression to the U.S. Government that the Defendants intended to honor the contract and meet their obligations to Ms. Gonzalez under U.S. law.

On its face, the written contract stated that Ms. Gonzalez would be paid $6.72 per hour and would work a forty-hour work week, with overtime pay for any extra hours. Id. ¶ 13. In fact, Defendants paid Ms. Gonzalez a total of $500.00 per month for cooking, housecleaning, running errands, washing clothes and caring for their baby, including performing physical therapy on the baby. Id. ¶¶ 17-18. Ms. Gonzalez worked, on average, 77 hours per week as the Defendants' babysitter, cook and housecleaner; and thus, her average wage was approximately $1.60 per hour. Id. ¶ 17 That amount was far below the minimum wage required by District of Columbia and federal law.[4]

When Mr. Vila told Ms. Gonzalez that the couple would not actually pay her according to their contract, he promised that they would instead provide health insurance and justified the smaller wage by complaining about the cost of such insurance, food and rent. Id. ¶¶ 14, 27. Despite this promise, Ms. Gonzalez did not receive health insurance in the United States and had to pay all her medical bills without assistance from Defendants. Id. ¶¶27-28.

## II. DEFENDANTS' MOTION SHOULD BE DENIED BECAUSE DEFENDANTS HAVE OFFERED NO EVIDENCE THAT THEY ARE ENTITLED TO DIPLOMATIC IMMUNITY

Defendants' two-page motion does not offer any evidence to substantiate their claim that they are entitled to diplomatic immunity. The Motion contains no affidavits or documentary

[4] Even if Ms. Gonzalez had worked 40-hour weeks, rather than 77-hour weeks, her compensation of $500 per month would have still been far below the applicable minimum wage.

evidence from the Defendants or the Argentine government, or anyone else, supporting Defendants' claims of immunity. As a matter of law, the Motion is an insufficient basis for a dismissal pursuant to diplomatic immunity.

Defendants state, through their counsel, that they hold A-1 visas and that Mr. Vila is a diplomatic employee of the Embassy of Argentina in Washington, D.C. However, even if that is true -- and there is no evidence presented to establish its truth -- possession of an A-1 visa is not sufficient to prove entitlement to diplomatic immunity. *See* United States v. Al-Hamdi, 356 F.3d 564, 573 (4th Cir. 2004) ("possession of an A-1 visa, standing alone, cannot confer diplomatic immunity"); United States v. Noriega, 746 F. Supp. 1506, 1524 (S.D. Fla. 1990) ("The issuance of United States visas is an administrative action in connection with … immigration law and is quite independent of the process of diplomatic accreditation.") (citation omitted); *See also* Restatement (Third) of Foreign Relations Law of the United States § 464 (1986) Reporters' Note 1 ("[diplomatic] visas are sometimes issued as a courtesy … to persons other than diplomats, and they do not prove that the holder enjoys diplomatic status or is entitled to diplomatic privileges and immunities in the receiving state") (citation omitted).

Defendants' counsel also claims, without any evidentiary support, that the Government of Argentina has asserted immunity on Defendants' behalf. Motion to Dismiss at 1. However, even if that unsupported assertion is true, diplomatic immunity cannot be unilaterally asserted by a sending state. Rather, "the Vienna Convention … premise[s] diplomatic immunity upon recognition by the receiving state." United States v. Lumumba, 741 F.2d 12, 15 (2d Cir. 1984). Defendants must therefore show that the Department of State has recognized their entitlement to immunity. Jungquist v. Nahyan, 940 F. Supp. 312, 321 (D.D.C. 1996) (rev'd. in part on other grounds). In Jungquist the court refused to dismiss certain defendants on the basis of diplomatic

immunity where it had no evidence before it that the State Department considered them to be entitled to such immunity. Id. at 322.

> The manner by which an individual secures a dismissal on the basis of diplomatic immunity is set forth in Carrera v. Carrera, 174 F.2d 496 (D.C. Cir. 1949). "It is enough that an ambassador has requested immunity, that the State Department has recognized that the person for whom it was requested is entitled to it, and that the Department's recognition has been communicated to the court."

Id. at 321 (citations omitted). *See also* Restatement (Third) of Foreign Relations Law of the United States § 464 Reporters' Note 1 ("In the United States, a person's diplomatic status is established when it is recognized by the Department of State."). Here, Defendants have not even tried to show that the State Department recognizes them as diplomatically immune. Nor have they provided any evidence that the ambassador of Argentina has attempted to assert immunity. A bare unsubstantiated statement by Defendants' counsel in a motion to dismiss is hardly sufficient to establish such "facts." Accordingly, the Motion must be denied.

## III. THE DEFENDANTS ARE NOT ENTITLED TO IMMUNITY FROM MS. GONZALEZ'S CLAIMS BECAUSE THEIR EMPLOYMENT AGREEMENT WITH HER RELATED TO "PROFESSIONAL OR COMMERCIAL ACTIVITY" OUTSIDE MR. VILA'S "OFFICIAL FUNCTIONS"

The Vienna Convention specifies the circumstances under which diplomats working in the United States enjoy immunity from criminal prosecution and civil and administrative liability. Vienna Convention supra at 2, art. 31. A grant of immunity under the Convention typically applies both to the diplomat and to members of his family in the United States. Id., art. 37(1). However, Article 31 specifies several circumstances under which the diplomatic agent and/or his family members will not be immune. Two of those exceptions apply here.

Article 31(1)(c) states that a diplomatic agent will ***not*** be immune "in the case of ... (c) an action relating to ***any professional or commercial activity*** exercised by the diplomatic agent

in the receiving State outside his official functions." (emphasis added). Thus, there is no immunity under the Convention if one or both of the Vilas are engaged in activities that are outside the diplomat's "official functions" and are ***either*** "professional" ***or*** "commercial." As discussed in Parts A and B, below, both prongs of the exception apply here because (i) the reason for Ms. Gonzalez's employment was to allow Ms. Nielsen to further her professional career (as a lawyer) while in the United States, and (ii) Ms. Gonzalez's employment was in any event a "commercial" activity within the meaning of the Convention. Moreover, as discussed in Part C, below, Ms. Gonzalez's employment was "outside [Mr. Vila's] official functions."

A. Defendants Are Not Immune from Ms. Gonzalez's Claims Because Their Employment of Her Was Intended to Further "Professional Activity" by Ms. Nielsen.

Mr. Vila and Ms. Nielsen were Ms. Gonzalez's joint employers. Compl. ¶ 5.[5] Ms. Gonzalez was hired to perform housework at the Vila/Nielsen residence, and to take care of the couple's baby. Id. ¶ 6. She worked primarily under the direction of Ms. Nielsen, who assigned her work responsibilities and who was the person most involved with Ms. Gonzalez's schedule. Id. ¶ 20. Importantly, Ms. Gonzalez was hired principally to facilitate Ms. Nielsen's legal studies. Id. ¶ 8. ("It was necessary for the Vilas to have a child-care provider because Ms. Nielsen wanted to continue pursuing her legal education in the U.S.").

The immunity enjoyed by each Defendant in his or her role as Ms. Gonzalez's employer must be analyzed separately. For example, although Mr. Vila is immune with respect to activities related to his job, if Ms. Nielsen were employed she would not be immune with respect to hers because spouses of diplomats do not enjoy immunity in connection with their own employment. *See* Eileen Denza, Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations 251 (1976) ("The spouse of a member of the mission who works as a doctor, teacher or administrator in the receiving State may … be sued in respect of these

[5] Under the Fair Labor Standards Act of 1938, "[a] single individual may stand in the relation of an employee to two or more employers." 29 C.F.R. § 791.2(a). There is joint employment when "the facts establish … employment by one employer is not completely disassociated from employment by the other employer(s)". Id. Here, there was joint employment because, among other reasons, Ms. Gonzalez's work benefited both Defendants. In addition, although Ms. Gonzalez's contract was with Mr. Vila, she was supervised primarily by Ms. Nielsen. As joint employers, Mr. Vila and Ms. Nielsen were "responsible, both individually and jointly, for compliance with all of the applicable provisions of the [FLSA], including the overtime provisions." Id.

activities"). Thus, although Ms. Nielsen's immunity is derived from Mr. Vila's, its scope must be evaluated separately, and based on her own conduct.

If discovery is permitted, as it should be, the evidence will show that Ms. Nielsen was a lawyer in Argentina. She was not employed by the Argentine embassy and was not otherwise permitted to work in the United States. Thus, she made the sensible choice of furthering her "professional" career while in the United States by taking additional legal courses at a time when her visa prohibited her from working. She could only do that, however, if she had domestic help while she pursued her career studies. Ms. Gonzalez was employed expressly for that pursuit, i.e., to facilitate Ms. Nielsen's "professional" career, which would presumably resume when Ms. Nielsen returned to Argentina. As they explained to Ms. Gonzalez while in Argentina, Defendants specifically hired Ms. Gonzalez in order to permit Ms. Nielsen to go to school. Ms. Nielsen's choice to pursue legal studies in the United States, and to employ Ms. Gonzalez in order to make those professional studies possible, was lawful and valid.[6] But as the Convention itself makes clear, when the spouse of a diplomat pursues such "professional" activities outside the official job functions of her husband, she is not protected by diplomatic immunity from any resulting liability.

In interpreting any treaty, courts begin with its text and "the context in which the written words are used." Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 534 (1991) (internal citations omitted). Pursuit of an advanced professional degree is a "professional activity" in the ordinary

---

[6] It is immaterial that Ms. Gonzalez's childcare and housecleaning also freed Mr. Vila to perform his duties as a diplomat. So long as Ms. Gonzalez's suit is "an action relating to any professional or commercial activity" outside of Mr. Vila's official functions, Defendants are not immune under Article 31(1)(c) (emphasis added). Plainly, the Complaint. relates to Ms. Nielsen's professional activity.

meaning of that phrase.[7] *See, e.g.,* American Heritage Dictionary 1446 (3d ed. 1996) (defining "professional" as "[o]f, relating to, engaged in, or suitable for a profession: *a professional field such as law; professional training*) (italics in original). Ms. Gonzalez worked for Defendants in connection with, and in furtherance of, this professional activity of Ms. Nielsen. Although Ms. Gonzalez's employment activities are not themselves a "professional activity" within the meaning of the Convention, they ***"relat[e] to"*** a "professional activity" carried on by Ms. Nielsen and hence are subject to the exception.

In that sense, the Gonzalez employment contract is no different than the tuition contract between Ms. Nielsen and her U.S. law school, under which she obtained a professional education in return for payments of tuition. Ms. Nielsen could not conceivably claim that the Convention's grant of immunity allows her to obtain the benefits of an education while refusing to honor her agreement to pay tuition. That is because the tuition contract is plainly "relate[d] to. . . .professional . . . activity . . . outside [Mr. Vila's] official functions." Equally, Ms. Nielsen cannot use the Convention as a shield to avoid her obligations under the employment contract with Ms. Gonzalez, whose job was to care for Ms. Nielsen's home and child so that she could pursue her professional activities outside the home. In each instance, the contract "relates to. . . professional activity," and is therefore not immunized by the Convention.

The allegations of the Complaint. are sufficient to rebut Defendants' claim of immunity. But if there is any doubt about that, discovery should be permitted to address this jurisdictional issue. Discovery will show that Ms. Nielsen was pursuing a L.L.M. in the United States in order to further her professional career as an attorney in Argentina. Ms. Gonzalez is entitled to the

---

[7] Plaintiff is unaware of any case law giving a special interpretation of, or meaning to, the phrase "professional activity" under the Vienna Convention. In the absence of such case law, the term should be given its ordinary and usual meaning.

opportunity to explore these facts and to show that the "professional activity" exception applies here. *See* Ignatiev v. United States, 238 F.3d 464, 467 (D.C. Cir. 2001) ("We have previously required that plaintiffs be given an opportunity for discovery of facts necessary to establish jurisdiction prior to decision of a 12(b)(1) motion"); Goodman Holdings v. Rafidain Bank, 26 F.3d 1143, 1147 (D.C. Cir. 1994) ("The Federal Rules of Civil Procedure generally provide for liberal discovery to establish jurisdictional facts") (citations omitted); Millicom Int'l Cellular v. Costa Rica, No. Civ. A. 96-315 (RMU) 1997 WL 527340, *7 (D.D.C. Aug. 18, 1997) (permitting limited jurisdictional discovery to ascertain applicability of Foreign Sovereign Immunities Act).

B. The Defendants Are Not Immune from Ms. Gonzalez's Claims, Because Their Employment of Her Was a "Commercial Activity"

1. The Ordinary Meaning of "Commercial Activity" Encompasses Plaintiff's Employment Contract

"Commercial Activity" is not defined in the Vienna Convention, but the ordinary meaning of the terms "commercial" and "activity" encompasses the conduct at issue. Defendants contracted with Ms. Gonzalez to exchange money for her services as a childcare provider and domestic worker. Compl. ¶¶ 11-12. An exchange of money for services is an example of "commercial activity" in its ordinary meaning. Childcare and housecleaning are both services that regularly occur in the marketplace and that involve the exchange of services for payment at a specified market rate. Ms. Gonzalez's employment by the Vila/Nielson household was, from her perspective, simply a job; and the regular exchange of money for her labor was thus "commercial activity."

2. The Defendants' Employment Contract with Ms. Gonzalez is "Commercial Activity" under the Foreign Sovereign Immunities Act, and that Act Should Guide this Court's Interpretation of the Same Phrase in the Vienna Convention

Although "commercial activity" is not defined in the Convention, nearly contemporaneous legislation with a similar purpose reinforces the notion that the term should be given its ordinary, common-sense meaning. In 1976, Congress adopted the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et. seq.*, which provides important guidance on the meaning of "commercial activity." The FSIA has a subject and purpose similar to that of the Vienna Convention: It establishes when state and federal courts have jurisdiction over foreign states, and when those states should be immune from suit. Just as diplomatic immunity under the Vienna Convention does not apply to "commercial activity" in the United States, so too the immunity granted by the FSIA does not apply to sovereign states engaged in "commercial activities" in the United States. Id. § 1602 ("Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned…").

While the FSIA attempted to define "commercial activity," its definition still "leaves the critical term 'commercial' largely undefined." Argentina v. Weltover, Inc., 504 U.S. 607, 612 (1992).[8] But the absence of a definition, though inconvenient, is hardly dispositive; as the Supreme Court observed, courts do not "have the option to throw up [their] hands" because "[t]he term has to be given some interpretation." Saudi Arabia v. Nelson, 507 U.S. 349, 359 (1993). Interpretations of "commercial activity" under the FSIA are particularly useful here, because the statute and the treaty are roughly contemporaneous and address similar subjects, and

---

[8] Under the FSIA commercial activity is "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

especially because the courts in FSIA cases have already grappled with what "commercial" means in the absence of statutory definition.[9]

"Commercial activity" under the FSIA has been interpreted to encompass the activity of a foreign government when it "acts ... in the manner of a private player within [a market]" instead of as a regulator of that market. Weltover, 504 U.S. at 614. "[T]he issue is whether the particular actions that the foreign state performs ... are the *type* of actions by which a private party engages in trade and traffic or commerce." Id. (internal quotation omitted). For example, when a foreign government issues regulations concerning foreign currency exchange, this would be a sovereign activity, not a commercial one, because a private party could not issue such regulations. Id. By contrast, when a foreign government purchases army boots or ammunition, this is a "commercial activity," "because private companies can similarly use sales contracts to acquire goods." Id. at 614-615 (internal citation omitted).

Employment contracts between foreign states and their employees can be either "governmental" or "commercial activity" within the meaning of the FSIA. If an employee is a civil servant or military personnel, then the employment relationship would be governmental, not commercial. El-Hadad v. Embassy of the United Arab Emirates, 69 F. Supp. 2d 69, 74 (D.D.C. 1999) (rev'd. in part on other grounds). By contrast, the employment of laborers or clerical staff

[9] The Fourth Circuit rejected the use of the FSIA as an interpretative guide for the Vienna Convention in Tabion v. Mufti, 73 F.3d 535, 539 n.7 (4th Cir. 1996), on the grounds that the FSIA is a statute, not a treaty, and was enacted after the Vienna Convention. Those distinctions are insubstantial and unpersuasive. Both the treaty and the statute were adopted by the U.S. Government at roughly the same time. Moreover, the fact that the FSIA was not a source of the Vienna Convention does not diminish its usefulness as a guide to the construction of terms that appear in both texts. Tabion also rejected the use of the FSIA on the basis that the statute was not intended by Congress to affect diplomatic immunity under the Vienna Convention. Id. (citing H. Rep. No. 1487, 94th Cong. 2d Sess. 12 (1976)). This is a non-sequitur. If "commercial" is interpreted to mean the same thing in both the Vienna Convention and the FSIA, that need not be because the statute changed anything about the treaty.

is a "commercial" activity. Id. Thus, in Janini v. Kuwait University, 43 F.3d 1534, 1537 (D.C. Cir. 1995), the Court of Appeals held that Kuwait's termination of an employment contract with a Kuwait University chemistry teacher was "commercial activity" within the meaning of the FSIA, even though Kuwait accomplished the termination by a formal decree of abrogation arising out of the invasion of Kuwait by Iraq.[10] "[T]here is nothing 'peculiarly sovereign' about unilaterally terminating an employment contract. Private parties often repudiate contracts in everyday commerce and may be held liable therefore." Id.

Similarly here, there is nothing especially "governmental" or diplomatic as opposed to commercial about Defendants' contract with Ms. Gonzalez. Ordinary private parties hire nannies and domestic help in everyday commerce. Private parties who breach such contracts can be held liable for their breach. For that reason, an employment contract and course of conduct between a diplomat and his servant should be treated as "commercial activity" within the meaning of the Vienna Convention, just as it would be under the FSIA. Then, so long as the activities involved were also outside the diplomat's official functions, they would not be immune under Article 31(1)(c).

On facts similar to those here, the Ninth Circuit rejected a claim of sovereign immunity under the FSIA, holding that a foreign consular officer's employment contract with a domestic servant was "commercial activity" within the meaning of the FSIA. Park v. Shin, 313 F.3d 1138, 1145 (9th Cir. 2002). The defendants in that case, the Deputy Consul General of the Korean Consulate and his wife, argued that the hiring and payment of their personal employee was not "commercial activity," both because they needed a domestic worker to assist them in performing

[10] Kuwait considered the invasion to be a case of force majeure that rendered contracts with non-Kuwaitis impossible to enforce. Janini, 43 F.3d at 1535.

their official functions (including entertaining guests), and because "only a government official could procure the A-3 visa that permitted Plaintiff to enter the United States and to work for" them. Id. at 1145. The court rejected those arguments, noting that acts by government entities are still "commercial" if the role played is "one that could be played by a private actor." Id. (citations omitted). Moreover, the court held that the employment was "commercial activity" because"[t]he act of hiring a domestic servant is not an inherently public act that only a government could perform. To the contrary, private actors commonly employ domestic servants." Id.

The same result should obtain here. Just as "the hiring and payment of Plaintiff" as a household employee in Park "was a commercial activity for the purposes of the FSIA," so too Ms. Gonzalez's employment as a nanny and domestic worker should be deemed "commercial activity" within the meaning of the Vienna Convention. No meaningful distinction can be drawn between the use of that term in the Convention and in the statute.[11]

3. Defendants' Reliance on Tabion v. Mufti Is Misplaced

Defendants' motion cites just one case, Tabion, 73 F.3d 535, without further elaboration. As discussed below, Tabion was incorrectly decided and should not be followed by the Court in this case. Moreover, even if Tabion were correctly decided, the facts of Ms. Gonzalez's case are distinguishable and should lead to a different result.

In Tabion a domestic worker from the Philippines sued her employers, a Jordanian diplomat and his wife. The plaintiff alleged that her employers had breached their employment contract with her and that her low pay and poor working conditions violated federal law. Id. at

[11] In Park, the defendants' purported immunity derived from the Vienna Convention on Consular Relations, not the Vienna Convention on Diplomatic Relations. That difference is immaterial to Park's analysis of "commercial activity" within the meaning of the FSIA.

536. The Fourth Circuit expressly conceded that the ordinary meaning of "the phrase 'commercial activity' could logically encompass" the couple's dealings with their employee, but then rejected the ordinary meaning of those words and instead reached a result that contradicts the purpose and language of the Convention.

Tabion's conclusion, that the employment contract could not be a commercial activity, appears to be premised on the notion that "commercial activities" within the meaning of the Vienna Convention must involve the pursuit of profit by the employer.[12] The court's reasoning seems to be that because the defendants' employment of plaintiff did not generate "monetary profit" for the employer, it could not have been a "commercial activity." 73 F.3d at 538 (citing State Department's statement of interest interpreting "commercial activity" as "focus[ing] on the pursuit of trade or business activity"); id. at 539 n.9 (discussing concern that, given reciprocal nature of agreement, American diplomats would be forced to "defend lawsuits over living services that result in no monetary profit to them"). As the Fourth Circuit itself appeared to recognize, that result cannot be squared with the ordinary meaning of the term "commercial activity." Nor does it comport with fairness or common sense.

First and foremost, nothing in the Convention defines "commercial activity" as requiring work "for profit," or even suggests such a definition. That requirement has no basis in the Convention, and conflicts with other sections of the Convention. For example, Article 42 of the Convention independently forbids diplomats from pursuing personal profit in any commercial activity. *See* Vienna Convention, supra at 2 , art. 42 ("A diplomatic agent shall not in the

---

[12] The opinion also relies heavily upon a statement of interest filed by the Department of State in that case. As discussed below, the Department has since issued regulations and diplomatic circular notes which take the position that personal employees of diplomats are in fact protected by federal and state employment laws while they work in the United States.

receiving State practice for personal profit any professional or commercial activity"). Tabion notes that some federal government officials advised Congress during its consideration of the Convention that the commercial activity exception was "minor and probably meaningless because it merely exposed diplomats to litigation based upon activity expressly prohibited in Article 42." Tabion, 73 F.3d at 538 n.6. (citations omitted). This appears to be the basis of the court's conclusion that "commercial activities" really means "commercial activities practiced for personal profit."

This reasoning is flawed. If the phrase "commercial activities" by itself already encompasses the notion of "personal profit," then the words "for personal profit" in Article 42 would be wholly superfluous. A cardinal principle of statutory construction is that all parts of the statute should be given meaning: "[I]t is generally presumed that statutory language is not superfluous." Arlington Central Sch. Dist. Bd. of Educ. v. Murphy, 126 S. Ct. 2455, 2460 n.1 (2006). If "personal profit" is to have meaning in Article 42, then it must have meaning independent of "commercial activity."

Conversely, if the drafters of the Vienna Convention had intended to limit "commercial activities" to those activities by which a diplomat personally earns a profit, they could easily have included the phrase "for personal profit" in 31(1)(c), just as they did in Article 42. But in fact, the drafters did not do so; and when the United States later ratified the treaty, it did not seek to amend it or clarify this point. According to a common principle of statutory construction, "a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." Hamdan v. Rumsfeld, 126 S. Ct. 2749, 2765-2766 (2006) (citing Russello v. United States, 464 U.S. 16, 23 (1983) ("where Congress includes particular language in one section of a statute but omits it in another section of the same

Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion")). The use of the phrase "personal profit" in Article 42 and its absence from Article 31(1)(c) strongly support the notion that the exclusion in 31(1)(c) is deliberate and that the Vienna Convention creates an exception to diplomatic immunity for commercial activity generally in Article 31, while prohibiting outright only commercial activity pursued for profit in Article 42.[13]

In any event, as discussed in Part IV below, official pronouncements by the State Department issued ***after*** Tabion strongly support the notion that domestic employees like Ms. Gonzalez have the right to redress violations of U.S. employment law in the United States, notwithstanding the Vienna Convention.

C. Defendants' Employment Relationship with Ms. Gonzalez Falls Outside Mr. Vila's Official Functions

As already noted, the "professional or commercial activity" exception applies only to activity "exercised by the diplomatic agent outside his official functions." In determining whether immunity should apply, it is important to examine the purpose of the employment agreement with Ms. Gonzalez, and the nature of her duties. Significantly, those duties had nothing to do with Mr. Vila's official diplomatic functions, and nothing to do with the Argentine embassy. Here, the Defendants' employment relationship with Ms. Gonzalez was outside Mr. Vila's official functions within the meaning of the Convention. First, Ms. Gonzalez's domestic employment by the Vilas was a personal convenience for them and had nothing to do with Mr. Vila's work as a diplomat at the Argentine embassy. Second, as noted above, the true purpose of

[13] But cf. Logan v. Dupuis, 990 F. Supp. 26, *30-31 (D. D.C. 1997) (relying on Tabion and holding that defendant diplomat's lease of residential property was not "professional or commercial activity" within the meaning of 31(1)(c)).

Ms. Gonzalez's employment was to enable Ms. Nielsen to advance her professional development.

1. Ms. Gonzalez's Child Care and Housework Are Unrelated to Mr. Vila's Official Functions

Ms. Gonzalez's duties, consisting of babysitting and domestic chores, had nothing to do with Mr. Vila's official diplomatic functions. She was paid by the Defendants personally and was never an employee of the Argentine embassy. On similar facts, the Ninth Circuit has found that the services of a domestic servant were not within the scope of "consular functions" within the meaning of the Vienna Convention on Consular Relations.[14] Park, 313 F.3d at 1142. The defendant consular officer in Park argued that his personal employee's services were within the scope of his consular functions on the theory that if the consular officer himself had to cook, clean and watch his own children, he would not be able to fulfill his official functions. Id. The court rejected that argument, stating that "[u]nder this theory, any personal service (from yard work to car repair) would become a consular function. . . . A direct, not an indirect, benefit to consular functions is required." Id. This analysis is directly contrary to the flawed reasoning of Tabion, in which the court held that domestic help is incidental to the daily life of the diplomat and therefore not to be treated as outside his official functions. 73 F.3d at 538-539.

Although Park interprets the Vienna Convention on Consular Relations, not the Vienna Convention on Diplomatic Relations at issue here,[15] its analysis of the scope of consular

[14] Vienna Convention on Consular Relations, 21 U.S.T. 77 (Apr. 24, 1963)

[15] As noted above, in addition to two narrow exceptions not relevant here, the Vienna Convention on Diplomatic Relations provides immunity for covered diplomats for all their activities *except* professional or commercial activities outside their official functions. The Vienna Convention on Consular Relations, which applies to "consular officers" offers more limited immunity; it provides immunity only for "acts performed in the exercise of consular

functions is equally applicable to the scope of the "official functions" at issue here. Both from a linguistic perspective and based on common sense, the Park approach is plainly superior to that of Tabion. The Tabion approach would render the term "outside his official functions" so broad as to be meaningless. It would swallow up the intended distinction, by making virtually everything that could be imagined -- from late-night bar tabs to beach vacations to dry cleaning services -- part of a diplomat's "official functions." Id. ("Day-to-day living services such as dry cleaning or domestic help were not meant to be treated as outside a diplomat's official functions"). If adopted, that approach, which treats every aspect of a diplomat's life as part of his "official functions," would render both prongs of the "professional or commercial activity" exception nugatory -- something that the Convention's drafters clearly did not intend.

Like the defendants in Park, Mr. Vila applied for an A-3 visa for Ms. Gonzalez. "Such visas are issued only for *personal* employees" and servants of diplomats and consular officers. Park, 313 F.3d at 1142 (citing 8 U.S.C. § 1101(a)(15)(A)(ii); 8 C.F.R. § 214.1(a)(2)) (emphasis in original). As in Park, Defendants, and not the Argentine embassy, paid Ms. Gonzalez. Finally, Ms. Gonzalez's babysitting and housecleaning did not relate to Mr. Vila's official functions. She did not, for example, do any cleaning at the embassy or cooking for

---

functions." 21 U.S.T. 77 art. 42. However, for purposes of the matters at issue here, the analysis of what is or is not within the scope of official functions is and should be the same.

Park rejected defendants' reliance on Tabion by distinguishing that case on the basis that it dealt with the Vienna Convention on Diplomatic Relations which it said provides "almost complete immunity to diplomats." Park, 313 F.3d at 1142 n.1. Park's comments about the scope of that treaty are, of course, dicta because the defendant was not covered by it. The Park defendant did not rely on the Convention on Diplomatic Relations, and the court did not consider it.

official dinners.[16] Therefore, Defendants' employment relationship was "outside [Mr. Vila's] official functions" within the meaning of Article 31(1)(c).

2. Ms. Nielsen's Legal Studies Are Outside Mr. Vila's Official Functions

Even if domestic help and babysitting are not always outside a diplomat's official functions, Ms. Gonzalez's suit is still an action relating to "professional . . . activity" exercised by Ms. Nielsen outside Mr. Vila's official functions because, as discussed above, she was hired to enable Ms. Nielsen to pursue her legal studies. Article 31(1)(c) does not require that the applicable cause of action deal exclusively with matters falling outside a diplomat's official functions; by its terms it applies to "an action relating to any professional or commercial activity exercised by the diplomatic agent … outside his official functions." (emphasis added). Therefore, it is immaterial that Ms. Gonzalez's work may also have enabled Mr. Vila to carry out his official duties; it is sufficient that this suit also "relates to" Ms. Nielsen's professional activities. Discovery will show that those professional activities were not in service of Mr. Vila's official functions.

Finally, it should be noted that Tabion did not address a situation like the one here, in which the Plaintiff's suit relates to the diplomat's spouse's activities outside the home and outside of official functions. Even the broad scope of "outside official functions" in Tabion, pursuant to which a diplomat is immune for services "incidental to [his] daily life," would not logically encompass services incidental to the professional education of the diplomat's spouse.

[16] In Park, the court found that the employee's work was not in the exercise of consular functions even though she did assist with the entertaining of visitors to the Consulate because "she spent most of her time caring for the Shins' children and cooking and cleaning for the Shins themselves." 313 F.3d at 1142.

## IV. THE DEPARTMENT OF STATE'S WRITTEN NOTICES TO FOREIGN GOVERNMENTS EVIDENCE AN UNDERSTANDING AND INTENTION THAT DOMESTIC EMPLOYEES LIKE MS. GONZALEZ SHOULD HAVE THE RIGHT TO SUE FOR VIOLATIONS OF U.S. EMPLOYMENT LAW

The Tabion decision relies heavily upon a statement of interest filed by the Department of State in that case, which concluded that the contract for domestic services at issue there was not "commercial activity" within the meaning of Article 31(1)(c). Tabion, 73 F.3d at 538 (giving "[s]ubstantial deference" to State Department interpretation as expressed in statement of interest). However, after Tabion was decided, the Department issued regulations and circular diplomatic notes[17] to diplomatic missions which state that personal employees of diplomats, like Ms. Gonzalez, may pursue claims for violations of their rights under United States and local law.

In a 1996 circular diplomatic note, the Secretary of State expressed the Department's "concern" about "problems which continue to arise in the working relationships between some members of the diplomatic ... community and their personal household employees." United States Department of State, Circular Diplomatic Note of May 20, 1996, available at: http://www.state.gov/documents/organization/32298.pdf. The Note cited examples of abuse that closely resemble what Ms. Gonzalez has alleged in her Complaint. For example, "the Department [of State] has been informed of instances where wages have been withheld . . . for undue periods; where the wages actually paid are substantially less than those stipulated at the time of employment . . . where the actual number of working hours weekly is substantially more than those originally contemplated and with no additional pay." Id. at 1. In light of these and

[17] The State Department corresponds with foreign governments by way of diplomatic notes. A "circular diplomatic note" "is an identical note sent to multiple foreign governments or missions." Al-Hamdi, 356 F.3d at 569 n.5 (citing United States Department of State, 5 Foreign Affairs Manual 212h; United States Department of State, 5 Foreign Affairs Handbook 1 H-612.2-7).

other problems, the Department "strongly encourage[d]" each prospective personal employee to submit with their application for an A-3 visa "a copy of an employment contract." Id. at 2. Such a contract, the Department stated, "must conform to all applicable federal laws" Id. at 3.

Of particular relevance here, the 1996 Note stated that the Department would "examine closely any case of alleged abuse of a personal servant, attendant or domestic that is brought to its attention...[and] [i]n appropriate circumstances the Department will ... inform the complainant that *redress may be available under federal or local* laws such as through the Wage and Hour Division of the United States Department of Labor in the case of unpaid wages." Id. at 4 (emphasis added). Thus, since at least 1996, the State Department has taken the position that domestic servants of diplomats in the United States have enforceable legal rights against their employers. The strong suggestion that such foreign workers enter into employment contracts before even applying for work visas or entering the United States, coupled with the requirement that their employment contracts "***must*** conform to all applicable federal laws" (emphasis added), is plain recognition that they will have enforceable employment rights under U.S. law. Moreover, the reference to "***redress***" that "may be available under federal or local laws" in the United States makes the matter crystal clear: The State Department intended domestic servants with A-3 visas to know, even before they came to the United States, that their employers were subject to U.S. employment laws, and that "redress" under U.S. law would be available to them if their employers violated the requirements of U.S. employment laws.

In 2000 the Department issued another circular diplomatic note in which it stated that the United States would henceforth require every would-be employer of a domestic employee applying for an A-3 visa to submit a written contract of employment. United States Department of State, Circular Diplomatic Note of June 19, 2000, available at:

http://www.state.gov/documents/organization/32298.pdf. The Note sets out the terms that the

employment contract should include, such as hours of work, and a minimum wage.[18]  The

Department warned that the "A-3 visa may be denied if there is reason to believe that the

employer has failed to fulfill his/her obligations." Id. at 3-4.  Further, the Department stated that

it would provide a copy of an enclosed information sheet to the A-3 visa recipients to inform

them "of their customary and legal rights while in the United States" and "provide[] a complaint.

telephone number… in the event the … employee believes his or her rights are not being

observed." Id. at 4.

     While the Note itself only implied that A-3 visa holders would have legal rights that

could be asserted against their diplomatic and consular employers, the enclosed information

sheet for the A-3 visa recipients made that point explicitly.  First, it stated that the required

employment contract would be considered by the United States "to be a true statement of your

terms of employment."  After listing a few of the required contract terms, the sheet informed the

domestic workers that "[t]he laws of the United States and the individual states may give you

additional rights, including protection from abuse…These rights are yours and should not be

denied to you."  Such a statement would make no sense -- and indeed would be a cruel and

misleading hoax -- if the Department believed that A-3 visa holders like Ms. Gonzalez did not

actually have rights under federal and state law, and the means to enforce them.  To the contrary,

the Department's statements plainly demonstrate its understanding and recognition that the grant

---

[18] The Note instructs that the "contract shall state the hourly wage to be paid … provided that the
rate will be the greater of the minimum wage under federal and state law or the prevailing wage
for all working hours.  The contract should state that wages will be paid to the domestic
employee either on a weekly or biweekly basis." Id. at 2.

of such rights, and of "redress" for their violation, was consistent with the terms of the Vienna Convention.

This understanding is also reflected in the Foreign Affairs Manual, which sets forth the Department of State's regulations for its own employees. The Manual provides guidance to consular officers considering applications for A-3 visas. It states that the A-3 visa application "must include an employment contract signed by the employer and the employee" that includes certain elements, such as compliance with the federal minimum wage. 9 FAM 41.21 N.6.2(a), available at: http://foia.state.gov//masterdocs/09fam/0941021N.pdf. "The contract is essential to the process in that it provides the personal employee with a framework within which he or she may *personally seek certain employment or human rights protections*." Id. N.6.2(c) (emphasis added). This view must be premised on an understanding that A-3 visa holders can sue their diplomatic and consular employers for breach of contract notwithstanding the Vienna Convention. Obviously, an A-3 visa holder such as Ms. Gonzalez could not "personally seek ... employment or human rights protections" under U.S. law if her employers could successfully assert diplomatic immunity.

Ms. Gonzalez has alleged abuse by Defendants of the very sort contemplated by the Department of State in its 1996 and 2000 circular notes and in its Foreign Affairs Manual. She should therefore have recourse to our legal system, as contemplated in those Notes and in the Department's regulations.

## V. DIPLOMATIC IMMUNITY SHOULD NOT EXTEND TO THOSE WHO, LIKE DEFENDANTS IN THIS CASE, OBTAINED ENTRY INTO THE UNITED STATES BASED ON MISREPRESENTATIONS AND DECEIT

Even if (contrary to what is set forth above) the Defendants were otherwise entitled to immunity under the Vienna Convention and none of the Convention's exceptions applied, the

Court should nevertheless deny their Motion. Here, Defendants obtained their asserted right to immunity and entered the United States based on representations to the United States Government that were knowingly false. They intentionally circumvented the State Department's requirement of a valid employment contract by entering into a contract that they intended not to honor. They showed the contract to the U.S. Government in order to obtain an A-3 visa for Ms. Gonzalez, and then refused to honor their contractual obligations, or even to give a copy of the contract to Ms. Gonzalez -- in the apparent belief that if she had no written evidence of the agreement, she would not be able to sue to enforce compliance.[19] As a purely equitable matter, no one should be able to invoke the immunity provided by the Convention to shield himself from the consequences of fraudulently entering the United States in the first place.

The preamble to the Convention states that the purpose of its immunities and privileges is "not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions." (emphasis added). Here, Defendants intended from the very beginning to use Mr. Vila's status as a diplomat to benefit themselves personally. If the allegations of the Complaint. are credited (as they must be for purposes of the current Motion), the Defendants perpetrated an intentional fraud upon the United States for the purpose of obtaining an A-3 visa for a personal servant whom they planned all along to pay an illegally low wage. This Court should reject out of hand Defendants' current assertion that the U.S. judiciary is powerless to remedy the fraud or to force Defendants to obey the employment laws which they represented, when they entered this country, they would honor.

[19] Much later, Ms. Gonzalez was able to obtain a copy of the agreement from the Argentine Embassy. She expects to produce it during discovery in this action.

It is now clear that Mr. Vila's sole purpose in entering into the written employment contract with Ms. Gonzalez was to mislead the U.S. immigration authorities into issuing an A-3 visa for her, so that the Defendants could bring a personal servant here without paying her the wages or benefits required by federal and local law.  When Ms. Gonzalez found the courage to complain about her abysmal working conditions, instead of redressing her concerns, Defendants said they would just pay for her to leave the country, Compl. ¶¶ 35-36, something they could not have done with an employee whose ability to work legally did not depend on them.

After signing the contract, Mr. Vila admitted to Ms. Gonzalez that he did not intend to actually comply with its terms and would pay her less than half the amount that he had contracted to pay her.  Id. ¶ 13.  To succeed in the scheme, he insisted that she too pretend that she would actually be receiving the wage set forth in the contract in her A-3 visa interview with U.S. Embassy employees. Id.  Thus, from the Defendants' perspective, the plain and only purpose of the written contract was to mislead the U.S. Embassy authorities and circumvent the United States' visa requirements.   The signers of the Convention, including the United States, cannot have intended immunity to be deliberately abused in such a premeditated fashion.  Immunity should not extend to those who, before even arriving in the United States, scheme to disobey its laws for their personal convenience and monetary benefit.

The preamble to the Vienna Convention states that the privileges and immunities it accords are meant to "contribute to the development of friendly relations among nations."  This purpose will be subverted if representatives of foreign governments are permitted to circumvent U.S. laws designed to protect workers from abuse -- and then insulate themselves from liability by citing diplomatic immunity.  The State Department has advised foreign missions that it is committed "to fair and reasonable labor conditions."  Circular Diplomatic Note of May 20, 1996

at 5-6. The regulations it has promulgated to carry out this commitment, such as requiring written contracts between A-3 visa holders and their employees, would be rendered meaningless if employers are permitted to submit sham contracts and force their employees to go along with the pretense in their visa interviews, and then assert immunity when called to account.

The true purpose of the Convention and its immunities, as noted above, is to promote the "efficient performance of the functions of diplomatic missions." This goal is in no way compromised by the requirement that foreign missions comply with American employment and immigration laws. Indeed, the State Department has expressed its confidence that the missions share its concerns about abusive employment relationships and share "its commitment to … fair and reasonable working and living conditions for all personal servants, attendants, and domestics employed by foreign government officials in the United States." Id. at 2. A ruling denying the Motion to Dismiss will further that laudable purpose.

CONCLUSION

For the reasons stated, Defendants' motion should be denied.

Respectfully Submitted,

/s/ Thomas F. Connell
Thomas F. Connell (D.C. Bar No. 289579)
Wilmer Cutler Pickering Hale and Dorr LLP.
1875 Pennsylvania Ave, N.W.
Washington, D.C. 20006
202-663-6000 (Phone)
202-663-6363 (Fax)

Muneer I. Ahmad (D.C. Bar No. 483131)
International Human Rights Law Clinic
American University Washington College of Law
4801 Massachusetts Ave., N.W., Suite 417
Washington, DC 20016
202-274-4147 (Phone)
202-274-0659 (Fax)

Counsel for Plaintiff Lucia Mabel Gonzalez Paredes

Dated: August 25, 2006