# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| LUCIA MABEL GONZALEZ PAREDES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. Act No. 06CV00089 PLF |
| | ) |
| JOSE LUIS VILA and MONICA NIELSEN, | ) |
| | ) |
| Defendants. | ) |

_____ )

**<u>MEMORANDUM OF LAW OF</u>**
**<u>THE AMERICAN CIVIL LIBERTIES UNION,</u>**
**<u>BREAK THE CHAIN CAMPAIGN,</u>**
**<u>CASA OF MARYLAND,</u>**
**<u>AND</u>**
**<u>GLOBAL RIGHTS – PARTNERS FOR JUSTICE,</u>**
**<u>*AMICI CURIAE*,</u>**
**<u>IN SUPPORT OF PLAINTIFF'S OPPOSITION TO</u>**
**<u>DEFENDANTS' MOTION TO QUASH SERVICE OF PROCESS</u>**
**<u>AND DISMISS COMPLAINT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTEREST OF *AMICI CURIAE* .............................................................................................1

SUMMARY OF ARGUMENT ...................................................................................................1

I.  ABUSE OF DOMESTIC WORKERS BY DIPLOMATS IN THE UNITED STATES IS
    WIDESPREAD AND WELL-DOCUMENTED...................................................................2

II. DIPLOMATIC IMMUNITY MUST NOT APPLY TO THE EMPLOYMENT OF
    DOMESTIC WORKERS AND RESULTING ABUSE .....................................................11

    A.  The Vila-Nielsen's Employment of Ms. Gonzalez Constitutes a Commercial
        Activity under the Vienna Convention on Diplomatic Relations Because the
        Diplomat's Relationship with the Domestic Worker was Clearly Commercial in
        Nature and Profitable to the Diplomat. .............................................................11

        1.  The employment of domestic workers constitutes a commercial activity
            because domestic work is a commercial enterprise. ....................................12

        2.  The underpayment of a domestic worker by a diplomat is a commercial
            activity because the diplomat profits from this activity...............................13

        3.  Diplomats engage in a commercial activity for personal profit when they
            deceive a domestic worker into entering into exploitative employment
            conditions......................................................................................................15

    B.  According to Long-Standing Principles of Statutory Construction, the
        Commercial Activities Exception Must Be Interpreted So As Not to Create an
        "Absurd Result." ................................................................................................16

    C.  The Commercial Activities Exception to Diplomatic Immunity Should Be
        Interpreted in a Manner Consistent with United States Policy and International
        Law. .....................................................................................................................18

        1.  The commercial activities exception should be interpreted in a manner
            consistent with the United States government's efforts to eradicate trafficking. ........18

        2.  The commercial activities exception must be interpreted in a manner
            consistent with international law. ..................................................................21

CONCLUSION.............................................................................................................................26

# TABLE OF AUTHORITIES[*]

## CASES

*El-Hadad v. Embassy of the United Arab Emirates*, 69 F. Supp. 2d 69 (D.D.C. 1999),
   *rev'd on other grounds*, 216 F.3d 29 (D.C. Cir. 2000) ............................................ 17

*Higgins v. Detroit Education Television Foundation*, 4 F. Supp. 2d 701 (E.D. Mich.
   1998) ........................................................................................................................ 14

*Jeremiah v. Richardson*, 148 F.3d 17 (1st Cir. 1998) ..................................................... 14

*Nchang v. Nyamboli*, Civil Case No. 0502-0001-794-2005 (Md. Cir. Ct., Prince George
   Cty. Nov. 30, 2006) ................................................................................................... 9

*\*Park v. Shin*, 313 F.3d 1138 (9th Cir. 2002) ................................................................ 17

*Southern New England Telephone Co. v. Department of Public Utility Control*, 874 A.2d
   776 (Conn. 2005) ...................................................................................................... 14

*Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996) ................................................................. 13

*United States v. Bouchey*, 860 F. Supp. 890 (D.D.C. 1994) ........................................... 15

*United States v. Schneider*, 14 F.3d 876 (3d Cir. 1994) ................................................. 18

*United States v. Veksler*, 862 F. Supp. 1337 (E.D. Pa. 1994), *aff'd*, 62 F.3d 544 (3d Cir.
   1995) ......................................................................................................................... 14

*Velazquez Rodriguez v. Honduras*, Inter-American Court of Human Rights (series C),
   No. 4 (July 29, 1988), *available at* http://www1.umn.edu/humanrts/iachr/
   b_11_12d.htm ............................................................................................................ 25

## STATUTES & REGULATIONS

22 U.S.C. § 288d(b) .......................................................................................................... 3

22 U.S.C. § 7101(a) .......................................................................................................... 19

22 U.S.C. § 7101(b)(1) ..................................................................................................... 19

22 U.S.C. § 7101(b)(4) ..................................................................................................... 19

22 U.S.C. § 7101(b)(8) ..................................................................................................... 16

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

22 U.S.C. § 7101(b)(12) ...............................................................................................16

22 U.S.C. § 7101(b)(14) ...............................................................................................19

22 U.S.C. § 7101(b)(17) ...............................................................................................19

22 U.S.C. § 7101(b)(20) ...............................................................................................20

22 U.S.C. § 7101(b)(21) ...............................................................................................21

22 U.S.C. § 7101(b)(23) ...............................................................................................23

22 U.S.C. § 7101(b)(24) ...............................................................................................21

22 U.S.C. § 7102(8)(b) .................................................................................................15

22 U.S.C. § 7105 ...........................................................................................................20

22 U.S.C. § 7109 ...........................................................................................................20

29 U.S.C. § 152(3)...........................................................................................................3

29 U.S.C. § 213(B)(21) ....................................................................................................3

Fair Labor Standards Act of 1938 (FLSA), 52 Stat. 1060, as amended, 29 U.S.C. § 201, *et seq.* (2004).......................................................................................................................5

*Victims of Trafficking and Violence Protection Act of 2000, Pub. L. 106-386, 114 Stat. 1466.............................................................................................................................15

Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 2(3), 117 Stat. 2875 (2003)..........................................................................................20

Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875 (2003) ...........................................................................20

29 C.F.R. § 552.102(b) ....................................................................................................3

29 C.F.R. § 552.110(b) ....................................................................................................3

29 C.F.R. § 1975.6............................................................................................................3

**MISCELLANEOUS**

Abolition of Forced Labor Convention (ILO No. 105), June 25, 1957, 320 U.N.T.S. 29, *entered into force for the United States* Sept. 25, 1991 ...........................................22

American Declaration of the Rights and Duties of Man, Apr. 1948, O.A.S. Res. XXX..............22

William Branigin, *Domestic Servants Protest Treatment*, Wash. Post, Sept. 29, 1999, at B4 ......................................................................................................................................4

Gilda Brancato, Office of the Legal Advisor, U.S. Dep't of State, Letter providing departmental guidance on the applicability of United States labor laws to foreign missions and their non-diplomatic personnel, at 3, Oct. 23, 1990 ..........................................17

Civil Rights Div., U.S. Dep't of Justice, *Report on Activities to Combat Human Trafficking, Fiscal Years 2001-2005, available at* http://www.usdoj.gov/crt/crim/trafficking_report_2006.pdf ...................................................19

Complaint, *Sabbithi v. Al Saleh*, Civil Action No. 0-70115EGS (D.D.C. filed Jan. 18, 2007) ......................................................................................................................................9

Complaint, *Swarna v. Al-Awadi*, No. 06cv4880 (S.D.N.Y. filed June 2006)..................................7

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, G.A. res. 39/46, *entered into force for the United States* Oct. 21, 1994 ....................................................................................................................22

Convention Concerning Forced or Compulsory Labor (ILO No. 29), June 28, 1930, 39 U.N.T.S. 55 ....................................................................................................................22

Convention on the Elimination of All Forms of Discrimination Against Women, Dec. 18, 1979, G.A. res. 34/180, U.N. Doc. A/45/49 ....................................................................22

*Crimes - Trafficking of Persons and Involuntary Servitude - Penalties: Hearings on HB 1473 Before the H. Comm. on the Judiciary*, 2005 Leg. (Md. Nov. 1, 2005) (testimony of Mildrate Yancho)................................................................................................8

Domestic Workers United & Datacenter, *Home Is Where The Work Is* (2006), *available at* http://www.domesticworkersunited.org/homeiswheretheworkis.pdf .................................12

Sandra Evans & John Burgess, *Maid Says Saudi Diplomat Withheld Wages, Food*, Wash. Post, Nov. 30, 1988, at D1 ................................................................................................4

First Amended Complaint, *Chere v. Taye*, No. 04cv6264 (D.N.J. filed June 30, 2005) ................8

Daniela Gerson, *A Slavery Case Nears Hearing in Manhattan: Servant Accuses Kuwaiti Diplomat*, NY Sun, Aug. 10, 2004..........................................................................................7

Martha Honey, *D.C.'s Indentured Servants*, The Progressive, Dec. 1997, *available at* http://www.findarticles.com/p/articles/mi_m1295/is_n12_v61/ai_20078650 ..........................4

http://www.state.gov/documents/organization/20047.pdf ..............................................................3

*Human Rights Watch, *Hidden in the Home: Abuse of Domestic Workers with Special Visas in the United States*, June 2001, *available at* http://www.hrw.org/reports/2001/usadom/usadom0501.pdf ...........................................3, 5, 10

Alan Hyde, *Who Speaks for the Working Poor?: A Preliminary Look at the Emerging Tetralogy of Representation of Low-Wage Service Workers,* 13 Cornell J.L. & Pub. Pol'y 599 (2004) ..........................................................................................................12

Internal Revenue Service Publication 926, *available at* http://www.irs.gov/publications/p926/ar02.html#d0e94 ........................................13

*International Convention on Civil and Political Rights, Dec. 16, 1966, G.A. res. 2200A (XXI), U.N. Doc. A/6316, 999 U.N.T.S. 17, *entered into force for the United States* Jun. 8, 1992....................................................................................22, 23, 24, 25

International Convention on the Elimination of All Forms of Racial Discrimination, G.A. res. 2106 (XX), Annex, 20 U.N. GAOR Supp. (No. 14) at 47, U.N. Doc. A/6014 (1966), 660 U.N.T.S. 195, *entered into force* Jan. 4, 1969.....................................23

International Covenant on Economic, Social and Cultural Rights, Dec. 16, 1966, G.A. res. 2200A(XXI) .........................................................................................22

International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families, Dec. 18, 1990 G.A. res. 45/158 annex, U.N. Doc. A/45/49 ..................................................................................................22

David Cay Johnston, *Despite an Easing of Rules, Millions Evade "Nanny Tax"*, N.Y. Times, Apr. 5, 1991 ...............................................................................12

Colbert I. King, *The Slaves in Our Midst*, Wash. Post, Dec. 23, 2006, at A21 ...............4

Letter from Embassy of the Republic of Cameroon to Elizabeth Keyes, CASA of Maryland, Inc. (June 1, 2006)....................................................................9

*Nonimmigrant Visas Issued by Classification: Fiscal Years 2001-2005*, available at http://www.travel.state.gov/pdf/FY05tableXVIb.pdf (last visited Jan. 16, 2007)...................10

Protocol to Prevent, Suppress and Punish Trafficking in Persons Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, Nov. 15, 2000, G.A. Res. 25, annex II, UN Doc. A/45/49, *entered into force for the United States* Dec. 3, 2005.......................................22

Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention against Transnational Organized Crime of 2000, Dec. 13, 2000, G.A. res. 55/25, annex II, 55 U.N. GAOR Supp. (No. 49) at 60, U.N. Doc. A/45/49 (Vol. I) (2001), *entered into force* Dec. 25, 2003...........................................................................................................................24, 25

Bharati Sadasivam, *Widening Women's choices: The case for childcare in the era of globalisation*, *in Harnessing Globalisation for Children: A Report to UNICEF* (Giovanni Andrea Cornia, ed. 2001), *available at* http://www.unicef-icdc.org/research/ESP/globalization/chapter15.pdf ................................................................12

Slavery, Security, Forced Labor and Similar Institutions and Practices Convention of 1926, Sept. 25, 1926, 60 L.N.T.S. 253, *entered into force for the United States* Mar. 21, 1929.........................................................................................................................22

Somini Sengupta, *Settlement Reached in Maid's Suit Against Diplomat*, N.Y. Times, July 15, 2000..............................................................................................................................8

Lena H. Sun, *"Modern-Day Slavery" Prompts Rescue Efforts*, Wash. Post, May 3, 2004.................................................................................................................4, 5, 6, 7, 10

Lena H. Sun, *Protection Sought for Diplomats' Domestics*, Wash. Post, May 26, 2004...............6

Supplementary Convention on the Abolition of Slavery, the Slave Trade and Institutions and Practices Similar to Slavery, Apr. 30, 1956, 226 U.N.T.S. 3, *entered into force for the United States* Dec. 6, 1967 ...........................................................................22

U.N. ESCOR, Hum. Rts. Comm., 59th Sess., U.N. Doc. E/CN.4/2003/85 (2002) ........................22

U.N. ESCOR, Hum. Rts. Comm., 60th Sess., U.N. Doc. E/CN.4/2004/76 (2004) ........................22

U.S. Dep't of State, Circular Diplomatic Note of June 19, 2000, *available at* http://www.state.gov/documents/organization/32298.pdf ........................................................4

U.S. Dep't of State, *Trafficking in Persons Report, 2003,* Jun. 11, 2003 *available at* http://www.state.gov/g/tip/rls/tiprpt/2003/21262.htm .............................................................19

U.S. Dep't of State, *Office to Monitor and Combat Trafficking in Persons, Trafficking in Persons Report* (2006), *available at* http://www.state.gov/documents/organization/66086.pdf ................................................................................................................................23

United Nations General Assembly Resolutions on Traffic in Women and Girls, 50/167 (Feb. 16, 1996)..................................................................................................................22

United Nations General Assembly Resolutions on Traffic in Women and Girls, 51/66 (Jan.31, 1997)...................................................................................................................22

United Nations General Assembly Resolutions on Traffic in Women and Girls, 52/98 (Feb. 6, 1998)................................................................................................................22

Universal Declaration of Human Rights, Dec. 10, 1948, G.A. res. 217A(II), U.N. Doc. A/180 at 71......................................................................................................22, 24

*Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 500 U.N.T.S. 95 (entered into force Apr. 24, 1964)..........................................................................................3, 11

## INTEREST OF *AMICI CURIAE*

*Amici Curiae* are non-governmental organizations working to combat the abuse of domestic workers by diplomats in the United States. The individual statements of interest for each *amicus* are listed in Appendix A. *Amici* have provided legal and other assistance to dozens of women who were lured to the United States under false promises of well-paid employment and fair treatment by foreign diplomats, only to find themselves trapped in situations of exploitation or forced labor. *Amici* have brought civil suits similar to that of Ms. Gonzalez's to enforce the rights of domestic workers exploited by diplomats, and have advocated for reforms to prevent diplomats from engaging in trafficking or exploitation of domestic workers. *Amici* have developed significant expertise regarding abuses experienced by domestic workers employed by diplomats and seek to share that expertise with the Court.

## SUMMARY OF ARGUMENT

Ms. Gonzalez is one of thousands of women who, in the past decade, have entered the United States on special visas to work as domestic employees in the homes of foreign diplomatic staff of embassies and of international organizations. Many of these workers toil for employers who are otherwise entitled to immunity from civil and criminal jurisdiction under the Vienna Convention on Diplomatic Relations. As a result of the hidden nature of their work, domestic workers serving foreign diplomats in their homes are some of the most vulnerable and severely exploited workers in the United States. *Amici*, as well as other human rights and legal service organizations, have documented a high rate of abuse of domestic workers by the diplomats who employ them in the United States. These well-documented violations range in severity from unpaid wages to physical abuse, rape, forced labor, and trafficking.

Far too often, diplomats defraud the U.S. government and their domestic worker employees in order to obtain visas to bring the workers to the United States. These diplomats

1

often fail to respect U.S. laws that set basic terms and conditions of employment.  Moreover, as required by the U.S. government, diplomats sign employment contracts with their domestic workers guaranteeing that they will provide fair conditions of employment, including prevailing wages, eight-hour work days, and medical care.  Many diplomats, however, flout their contractual and legal obligations once they arrive in the United States by subjecting their domestic workers to excessively long hours, confinement, non-payment of wages, and egregious physical and psychological abuse.  These workers are legally entitled to the robust protections afforded workers under U.S. law and must have the ability to enforce their rights in U.S. courts.

Part I of this brief highlights the abuses that *amici* have uncovered in working with the highly vulnerable population of migrants employed by diplomats in the United States.  Part II argues that the employment relationship between diplomats and domestic workers is a commercial activity within the exception to immunity under the Vienna Convention on Diplomatic Relations; and because the commercial activities exception should be interpreted in a manner consistent with United States policy, including efforts to eradicate trafficking and severe labor abuses domestically and internationally and to provide a remedy for victims of such abuses.  *Amici* strongly support Plaintiff's contention that Defendants should not enjoy impunity for the abuses that they committed while in the United States.

## I.      ABUSE OF DOMESTIC WORKERS BY DIPLOMATS IN THE UNITED STATES IS WIDESPREAD AND WELL-DOCUMENTED.

Female migrant domestic workers employed by diplomats are highly vulnerable to abuse.  Their work is hidden in the home and largely unregulated by the government.[1]  These women

---

[1] Domestic workers in general are vulnerable to abuse.  Because they work and live in the employer's home, they tend to work long hours in relative isolation.  They are often completely dependent on the employer for their food, clothing and living conditions.  Moreover, the employment relationship between domestic workers and their employers receives fewer protections under U.S. law than most other professions. Under federal law, for example, live-in

workers generally come from severely impoverished backgrounds, lack formal education, and speak little English.  They often lack exposure to and familiarity with United States law and law enforcement authorities.  In addition, their immigration status, pursuant to the A-3 or G-5 special visas for private servants of diplomats, is legal only so long as they remain employed by the diplomatic employer.[2]  Finally, their gender makes them a specific target for gender discrimination, sexual harassment, rape, and other abuses.

These vulnerabilities are exacerbated by the fact that the employers of domestic workers on A-3 or G-5 visas attempt to claim the protection of diplomatic immunity under the Vienna Convention on Diplomatic Relations.[3]  According to the Vienna Convention, although diplomats are required under international law to abide by U.S. federal and local laws, they are immune to the civil and criminal jurisdiction of U.S. courts, unless an exception to immunity applies.[4]

---

domestic workers are one of the few categories of employees not entitled to overtime wages under federal law.  29 U.S.C. § 213(b)(21).  Employers of live-in domestic workers are also exempt from the stringent recordkeeping requirements of hours worked which are the norm under federal law.  29 C.F.R. § 552.102(b); 29 C.F.R. § 552.110(b).  Domestic workers are also exempt from the NLRA and OSHA, and thus are not entitled to protections of their rights to organize for improved labor conditions.  29 U.S.C. § 152(3); Occupational Safety and Health Act (OSHA), 29 C.F.R. § 1975.6.

[2] Human Rights Watch, *Hidden in the Home: Abuse of Domestic Workers with Special Visas in the United States* 6 (2001) ("*Hidden in the Home*"), *available at* http://www.hrw.org/reports/2001/usadom/usadom0501.pdf.

[3] Some defendants inappropriately claim this immunity without any basis in law.  Diplomatic employers formally accredited by the U.S. Department of State generally enjoy immunity from civil jurisdiction under the Vienna Convention on Diplomatic Relations ("Vienna Convention"), art. 31(1), Apr. 18, 1961, 500 U.N.T.S. 95, *entered into force* Apr. 24, 1964.  International organization officials and employees, however, enjoy immunity from civil jurisdiction only for their official acts.  *See* 22 U.S.C. § 288d(b).  For the U.S. Department of State's summary of diplomatic and consular privileges and immunities, *see* http://www.state.gov/documents/organization/20047.pdf.

[4] Vienna Convention, art. 41(1) (providing that "it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving State").

Thus, unless such an exception applies, diplomats cannot be held accountable for failure to respect U.S. law even though they are required to comply with U.S. labor standards in their employment of domestic workers and to sign binding employment contracts in order to obtain special visas for these workers.[5]  Many diplomats, who may believe they are immune from accountability under U.S. law, disregard their obligations under U.S. law and exploit the domestic workers they employ.  The mere perception that these employers have "immunity" discourages exploited domestic workers from reporting or seeking help for these abuses.

Although undoubtedly severely underreported, given the vulnerability of domestic workers who possess special visas, it is not surprising that abuses of these workers are numerous. In the last decade alone, many domestic workers employed by diplomats have reported severe exploitation and abuse.[6]  In 2001, Human Rights Watch issued a report, *Hidden in the Home: Abuse of Domestic Workers with Special Visas in the United States*, documenting the widespread

---

[5] *See* United States Department of State, Circular Diplomatic Note of June 19, 2000, *available at* http://www.state.gov/documents/organization/32298.pdf.

[6] *See, e.g.,* Colbert I. King, *The Slaves in Our Midst*, Wash. Post, Dec. 23, 2006, at A21; Lena Sun, *"Modern-Day Slavery" Prompts Rescue Efforts: Groups Target Abuse of Foreign Maids, Nannies*, Wash. Post, May 3, 2004, at A1 (reporting that a Bangladeshi maid working for a Bahraini diplomat in New York was never paid or allowed to leave the apartment until she was rescued by police; an Indian maid for a diplomat in Potomac, Maryland was paid $100 for 4,500 hours of work over 11 months and physically and mentally abused; an Indonesian domestic servant employed by a diplomat at the United Arab Emirates Embassy in Washington, D.C. was physically abused, threatened with death, and underpaid); William Branigin, *Domestic Servants Protest Treatment*, Wash. Post, Sept. 29, 1999, at B4 (reporting that an Ethiopian domestic worker employed by an Ethiopian official of the International Monetary Fund (IMF) was paid 3 cents an hour for eight years of work and that a 22-year-old Ecuadorian woman was paid $1 an hour during her employment for an IMF official); Martha Honey, *D.C.'s Indentured Servants*, The Progressive, Dec. 1997, *available at* http://www.findarticles.com/p/articles/mi_m1295/is_n12_v61/ai_20078650 (reporting that a Filipina domestic servant employed by an IMF official was paid $230 per month for approximately sixteen hours a day, seven days a week); Sandra Evans & John Burgess, *Maid Says Saudi Diplomat Withheld Wages, Food*, Wash. Post, Nov. 30, 1988, at D1 (reporting that a Thai domestic worker for a defense attaché to the Saudi Arabian Embassy in Washington, D.C. alleged exploitation after escaping from the diplomat's home by crawling out a window).

and severe abuse of domestic workers employed by diplomats and staff of international

organizations.[7]  In its report, Human Rights Watch reviewed forty cases of domestic workers

with A-3 or G-5 visas and found that they worked, on average, fourteen hours each day and

earned a median hourly wage of $2.14, less than half of the national minimum wage of $5.15 per

hour.[8]  The report also concluded that in the majority of cases the workers were subjected to

unsafe sleeping and working conditions, including sleeping in unheated or unventilated rooms,

and working with harsh chemicals.[9]  Finally, the report described in detail the psychological and

physical abuse the workers suffered, including, *inter alia*, confiscation of their passports,

enforced confinement in the home, deprivation of food and other necessities, denial of medical

care, non-payment of wages, rape and sexual abuse, and beatings, threats and degrading

treatment aimed at coercing domestic workers to labor against their will.[10]

    The conditions described by *Hidden in the Home* mirror the conditions endured by

domestic workers who have sought the legal services of *amici* and of other cases reported in the

media.  The case of a forty-four-year-old woman brought to Washington from India to work as a

live-in domestic worker for an Asian diplomat illustrates these abuses.  As reported, she was

forced to work sixteen to eighteen hours per day, seven days a week, and was paid about 18 cents

an hour.[11]  Her employer's wife constantly screamed at her, calling her a "dog."  The diplomat

---

[7] *Hidden in the Home*, *supra,* at 1.

[8] *Id.* at 17.  The federal minimum wage for covered, nonexempt workers is $5.15 per hour.  Fair Labor Standards Act of 1938 (FLSA), 52 Stat. 1060, as amended, 29 U.S.C. § 201, *et seq.* (2004).

[9] *Hidden in the Home*, *supra*, at 15.

[10] *Id.* at 12-22.

[11] Lena Sun, *Modern-Day Slavery*, *supra*.

employer refused the employee permission to use the telephone, locked her outside overnight during winter, and threatened her with deportation.[12]  It was also reported that the worker was physically abused and denied medical treatment when she became ill.[13]  The domestic worker eventually fled to a church in Potomac, Maryland.

Alexandra Santacruz suffered similar abuses to Ms. Gonzalez.  According to reports, Ms. Santacruz, who was twenty-four years old at the time and was employed by the first secretary at the Ecuadorian mission to the Organization of American States, worked eighty-hour weeks as a nanny, cook, and housekeeper.  She received little more than $2.00 per hour.[14]  In 2004, two lawyers from CASA of Maryland, a workers' rights non-governmental organization and *amicus* here, rescued Ms. Santacruz from the Falls Church, Virginia townhouse where she was held.[15]

Another worker – who initially sought help from CASA of Maryland, but ultimately decided not to pursue her claims – came to the United States to work for the family of a German diplomat in Washington, D.C.  As reported, she was forced to work thirteen-hour days, five days a week, caring for the diplomat's children, cleaning, cooking, and performing gardening work.  She was paid only $1,000 for the entire year of work, roughly 48 cents per hour.  Her employers utterly neglected her medical needs, forcing her to work while she suffered a severe flu with high temperatures, and failing to pay for a necessary root canal.  The denial of dental care resulted in the permanent loss of four of her teeth.

---

[12] *Id.*

[13] *Id.*

[14] Lena Sun, *Protection Sought for Diplomats' Domestics: Rights Groups Cite Abuse of Workers*, Wash. Post, May 26, 2004, at A4; Lena Sun, *Modern-Day Slavery*, *supra*.

[15] Lena Sun, *Modern-Day Slavery*, *supra* (reporting that the lawyers "knocked on the door and confronted her stunned employer").

Many cases handled by *amici* rise to the level of human trafficking and slavery. Indicative of the scope of the problem of forced labor facing domestic workers, from 1998 to 2004, *amicus* CASA of Maryland estimates that they rescued more than 100 domestic workers, many of whom were employed by diplomats, from situations of bondage in the Washington, D.C. area.[16] One such example of forced labor is a case brought by Vishranthamma Swarna, an Indian domestic worker employed by a high-ranking minister at the Kuwaiti Mission to the United Nations. Ms. Swarna, who filed suit against her former employers in the Southern District of New York in 2006, stated in her Complaint that she traveled to the United States based on a promised salary of $2,000 per month.[17] Instead, her employers paid her just $200 per month, while forcing her to work eighteen hours each day. For four years, her Kuwaiti employers refused to permit Ms. Swarna to leave their Manhattan apartment unaccompanied, confiscating her passport and threatening her with physical harm if she attempted to escape. The diplomat and his wife heaped insults upon Ms. Swarna, screaming at her and subjecting her to constant psychological abuse. In the final two years of her servitude with the family, Ms. Swarna has testified, the male employer raped her at will, repeatedly.[18]

Beletashachew Ayenachew Chere, an Ethiopian woman who came to the United States on a special visa to work for an employee of the United Nations Development Programme, suffered similar abuses. Ms. Chere's complaint alleges that she was induced to travel to the United States to work as a nanny and part-time cook, but that she instead found herself held in involuntary servitude. Forced to work seven days each week for approximately eighteen hours

---

[16] *Id.*

[17] Complaint, *Swarna v. Al-Awadi*, 06cv4880 (S.D.N.Y. filed June 2006).

[18] *Id.* ¶¶ 80-83. *See also* Daniela Gerson, *A Slavery Case Nears Hearing in Manhattan: Servant Accuses Kuwaiti Diplomat*, N.Y. Sun, Aug. 10, 2004, at 1.

each day, Ms. Chere was never paid for seventeen months of work.  Like Ms. Swarna, Ms. Chere

also reported being sexually abused by her male employer.  Isolated from family and friends,

denied medical care, and imprisoned in the family's home, Ms. Chere finally escaped when a

relative in Chicago sent a taxi to New Jersey to fetch her. [19]

Shamela Begum, a mother of three from Bangladesh, moved to the United States with a

special visa to work for a diplomat at the Bahraini Mission to the United Nations in New York.

The diplomat reportedly took away Ms. Begum's passport as soon as she arrived, forced her to

work seven days a week, and forbade her to leave the apartment alone.  Ms. Begum was paid

only $100 per month.[20]

Mildrate Yancho came to the United States to work for a diplomat of the Cameroonian

Embassy.  She worked in his Greenbelt, Maryland home for eleven months, caring for his three

children, including a newborn baby.  She also did all the housework, cleaning and laundry.

According to Ms. Yancho, she was forced to work around the clock, but she never received a day

off.  On one occasion, the diplomat's wife beat Ms. Yancho so badly that it necessitated a

hospital visit.  Ms. Yancho received *no* money for the work that she performed.  The diplomat

also confiscated her passport.[21]  Ms. Yancho sued the diplomat in Maryland district court for the

return of her documents.  The judge issued a decision in her favor, but later vacated the decision

---

[19] First Amended Complaint, *Chere v. Taye*, 04cv6264 (D.N.J. filed June 30, 2005).

[20] Somini Sengupta, *Settlement Reached in Maid's Suit Against Diplomat*, N.Y. Times, July 15, 2000.  After Ms. Begum sued her employer in the Southern District of New York, the case was settled for an undisclosed amount. *Id.*

[21] *Crimes – Trafficking of Persons and Involuntary Servitude – Penalties: Hearing on HB 1473 Before the H. Comm. on the Judiciary*, 2005 Leg. (Md. Nov. 1, 2005) (testimony of Mildrate Yancho).

when the diplomat raised the defense of diplomatic immunity.[22]  She has never received any of the money owed her.  The Embassy of Cameroon formally declined to investigate the case, calling it a private matter between Ms. Yancho and the diplomat.[23]

Mani Kumari Sabbithi, Gila Sixtina Fernandes and Joaquina Quadros, three Indian domestic workers, were trafficked into the United States on A-3 visas by a Kuwaiti Attaché to the Embassy of Kuwait and his wife to work in their home in McLean, Virginia.  Despite their promises to provide these workers a lawful salary and work conditions, according to the workers' Complaint against the diplomat, his wife, and the State of Kuwait in D.C. District Court, the diplomat and his wife subjected these workers to enforced confinement in their home; sent the workers' families abroad approximately $242 to $346 per month, but paid the workers themselves nothing; forced them to work sixteen to nineteen hours per day, seven days a week; confiscated their passports; deprived them of food, rest and medical care; and threatened them with physical abuse in order to coerce their labor.[24]  It is also alleged that the diplomat and his wife severely beat and threatened Ms. Sabbithi regularly.  When the workers individually believed they would die or be killed if they did not escape, they fled the diplomat's home through the assistance of a generous neighbor.[25]

These cases – and others that have come to light through media reports and court filings – represent merely the tip of the iceberg.  It is nearly impossible to determine how many of the

---

[22] *Nchang v. Nyamboli*, Civil Case No. 0502-0001-794-2005 (Md. Cir. Ct., Prince George Cty. Nov. 30, 2006).

[23] Letter from Embassy of the Republic of Cameroon, to Elizabeth Keyes, CASA of Maryland, Inc. (June 1, 2006).

[24] Complaint, *Sabbithi v. Al Saleh*, Civil Action No. 0-70115EGS (D.D.C. filed Jan. 18, 2007).

[25] *Id.*

more than 2,200 A-3 and G-5 visas granted each year by the State Department to diplomats to bring their personal servants into the United States will be given to a worker who is subsequently exploited.[26]  Of the 30,000 such visas that were issued by the State Department in the 1990s,[27] *amici* are certain – given the volume of cases they handle concerning domestic workers employed by diplomats[28] – that a high percentage of workers with these visas suffered unlawful conditions of employment at the hands of their diplomat employers.

Deterred by fear and isolation, domestic workers abused by their diplomat employers often suffer in silence, unable to escape situations of forced labor or to navigate the legal system alone.  Domestic workers' lack of familiarity with the U.S. legal system, social and cultural isolation, fear of losing their immigration status and, often, fear of retaliation by politically powerful employers in their countries of origin, all create powerful disincentives to lodging complaints against abusive employers.[29]  The wrongful perception that their powerful employers have immunity compounds these workers' sense of hopelessness.  *Amici* estimate that for every case that comes to light, there are many more women suffering abuse by their diplomat employers who are unable to obtain help and fearful of speaking out.  Even for the courageous domestic workers who manage to overcome these barriers, like Ms. Gonzalez, diplomatic

---

[26] *Nonimmigrant Visas Issued by Classification: Fiscal Years 2001-2005*, *available at* http://www.travel.state.gov/pdf/FY05tableXVIb.pdf (last visited Jan. 16, 2007).  The State Department's preliminary data reflect the following statistics on visas issued: 3,873 A-3 and G-5 visas issued in 2001; 3,453 in 2002; 2,376 in 2003; 2,203 in 2004; and 2,225 in 2005, the last date for which statistics are publicly available.  *See also Hidden in the Home, supra*, at 2.

[27] *Hidden in the Home, supra*, at 4.

[28] For example, in 2004, *amici* CASA of Maryland and Break the Chain Campaign estimated that they received a total of 45 to 50 new domestic worker exploitation cases in the Washington area each year, many of whom were employed by diplomats or the staff of international organizations.  *See* Lena Sun, *Modern-Day Slavery*, *supra*.

[29] *Hidden in the Home, supra*, at 32.

immunity – and the resulting impunity that Defendants argue it should provide – is a key

obstacle to justice for victims.

Amici urge this Court to deny Defendants' motion to dismiss because whether a victim's

labor rights are violated (as here) or whether a victim is trafficked, beaten, or raped, the legal

principle is the same. The decision in this case will either keep the courthouse door open, or

slam it closed to Ms. Gonzalez and countless other domestic workers severely abused by their

diplomat employers.

## II. DIPLOMATIC IMMUNITY MUST NOT APPLY TO THE EMPLOYMENT OF DOMESTIC WORKERS AND RESULTING ABUSE

As a matter of law and policy, diplomatic immunity cannot apply to the hiring of

domestic workers and the resulting abuse of these workers. This Court should hold that a

diplomat's hiring and employment of a domestic worker falls squarely within the commercial

activity exception to diplomatic immunity under the Vienna Convention.

### A. The Vila-Nielsen's Employment of Ms. Gonzalez Constitutes a Commercial Activity under the Vienna Convention on Diplomatic Relations Because the Diplomat's Relationship with the Domestic Worker was Clearly Commercial in Nature and Profitable to the Diplomat.

Plaintiff's memorandum argues persuasively that the Vila-Nielsens' employment of Ms.

Gonzalez falls under the commercial activity exception to diplomatic immunity under the Vienna

Convention on Diplomatic Relations.[30] In addition to the arguments put forth by Plaintiff

Gonzalez, *amici* further argue below that the employment of domestic workers falls within the

commercial activity exception because the employment of cheap, migrant labor is a profitable

enterprise for employers. In particular, by virtue of the A-3 and G-5 visa program, diplomats can

benefit and profit even more from this market by personally seeking out cheaper and more

flexible laborers than those available in the United States and bringing them to the United States.

---

[30] Vienna Convention art. 31(1)(c).

This act is commercial in nature and should not be insulated by immunity under the Vienna Convention.

        **1.**        **The employment of domestic workers constitutes a commercial activity because domestic work is a commercial enterprise.**

The domestic worker market in the United States is an extensive and lucrative industry. The "hidden" nature of domestic work makes estimating the number of domestic workers employed in the United States extremely challenging. In 1998, the New York Times reported an IRS estimate that 4 million people in the United States employed household employees such as nannies and maids.[31] Other domestic worker statistics put the number at 1.13 million household workers nationwide.[32] A 2006 survey of domestic workers in New York City, conducted by the group Domestic Workers United, estimated that between 200,000 and 600,000 domestic workers were employed in New York City alone.[33] In the field of childcare, an estimated one million nannies work in American homes.[34] With at least 1 million childcare workers in the United States, simple multiplication indicates that childcare alone is a multi-billion dollar industry.[35]

---

[31] David Cay Johnston, *Despite an Easing of Rules, Millions Evade "Nanny Tax"*, N.Y. Times, Apr. 5, 1991.

[32] Alan Hyde, *Who Speaks for the Working Poor?: A Preliminary Look at the Emerging Tetralogy of Representation of Low-Wage Service Workers,* 13 Cornell J.L. & Pub. Pol'y 599, 609 (2004).

[33] Domestic Workers United & Datacenter, *Home Is Where The Work Is* 1 & n.2 (2006), *available at* http://www.domesticworkersunited.org/homeiswheretheworkis.pdf.

[34] Bharati Sadasivam, *Widening women's choices: The case for childcare in the era of globalisation*, *in* HARNESSING GLOBALISATION FOR CHILDREN: A REPORT TO UNICEF 25-26 n.36 (Giovanni Andrea Cornia, ed. 2001), *available at* http://www.unicef-icdc.org/research/ESP/globalization/chapter15.pdf.

[35] Assuming, for the sake of argument, that each nanny works forty hours per week, earns minimum wage, and receives two weeks of paid vacation, the nanny industry alone would generate approximately $10,300,000,000 annually in gross wages.

The U.S. government, moreover, treats the domestic work market as a commercial enterprise.  The IRS requires individuals who hire a domestic employee to perform household work, and who pay that household employee more than $1,500 per year, to cover employment taxes for that employee.[36]  A household employer who pays someone to work in his or her home must withhold Social Security and Medicare taxes from the wages paid to that employee, just as he or she would if running a business.

As Plaintiff's Memorandum explains in detail,[37] the decision in *Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996), which holds that the employment of a domestic worker is not a commercial activity, flouts the rules of logic and interpretation.  Because of the widespread reach of the domestic worker market, because of its governmentally recognized commercial nature, and because of its impact on commerce, this Court should reject the *Tabion* decision and conclude that entering an employment contract for domestic work constitutes commercial activity on the part of a diplomat.

> **2.      The underpayment of a domestic worker by a diplomat is a commercial activity because the diplomat profits from this activity.**

Even if this Court applies the *Tabion* decision's artificially narrow definition of commercial activity, this Court should still find that the Vila-Nielsen family engaged in a commercial activity when they underpaid Ms. Gonzalez – because they profited as a result. The *Tabion* court wrote that "the term 'commercial activity' . . . relates . . . to trade or business activity engaged in for personal profit."  *Tabion*, 73 F.3d at 537.  The *Tabion* court did not take into adequate consideration the argument that a diplomat who exploits a domestic worker with a special visa profits by avoiding the need to pay fair market wages for domestic work.  Here, the

---

[36] Internal Revenue Service, Publication 926, *available at* http://www.irs.gov/publications/p926/ar02.html#d0e94.

[37] Pl. Mem. 16-18.

Vila-Nielsens profited from their employment contract with Ms. Gonzalez, in the amount of $13,078.44 – the wages Ms. Gonzalez was promised and never paid.[38]

Were it not for the exploitation of Ms. Gonzalez, the Vila-Nielsens would have had to pay the market rate – at least minimum wage, and perhaps higher – for the work Ms. Gonzalez performed; however, their special employment relationship with Ms. Gonzalez enabled them to pay far less money for much more work than a typical market participant in the United States would accept.

Courts have long recognized that the money saved by *not paying* a sum one is obligated to pay is equivalent to a *profit*. *See, e.g.*, *Jeremiah v. Richardson*, 148 F.3d 17, 20 (1st Cir. 1998) (noting that bankruptcy trustee "earned approximately $5,000 per month '*profit*' . . . only by *not paying* any debt service (i.e., the mortgage), any real estate taxes, or any payments on the Center's prepetition outstanding obligations") (emphasis added); *Higgins v. Detroit Educ. Television Found.*, 4 F. Supp. 2d 701, 710 (E.D. Mich. 1998) (noting that the entity "maximized its *profits* by *not paying* any licensing or permission fees" on copyrighted materials) (emphasis added); *United States v. Veksler*, 862 F. Supp. 1337, 1340 (E.D. Pa. 1994) (describing "daisy chain" scheme in which "the *profit* gained by *not paying* the taxes was divided among the conspirators") (emphasis added), *aff'd*, 62 F.3d 544 (3d Cir. 1995); *S. New England Tel. Co. v. Dep't of Pub. Util. Control*, 874 A.2d 776, 783 (Conn. 2005) (warning that a utility should not be permitted "reap windfall *profits*, as a result of *not paying* labor costs") (emphasis added).

Here, the Vila-Nielsens profited from their employment relationship with Ms. Gonzalez by paying her only $1.60 per hour – a fraction of the wage promised in the contract or required by law – for the extensive, round-the-clock services Ms. Gonzalez provided. The Vila-Nielsens

---

[38] Complaint ¶ 60.

would otherwise have paid minimum wage or higher for the diverse services Ms. Gonzalez performed: a child care provider, a physical therapist, a maid, an errand runner, a laundress, and a cook.  Accordingly, Mr. Vila and Ms. Nielsen profited handsomely by receiving these services practically for free.[39]  Their illegitimate profit brings their contract well within the ambit of the commercial activity exception to diplomatic immunity, even under the *Tabion* "for personal profit" standard.[40]

> **3.** **Diplomats engage in a commercial activity for personal profit when they deceive a domestic worker into entering into exploitative employment conditions.**

Additionally, diplomats engage in a separate form of commercial activity when they use deception and fraud to procure exploited labor for their own personal profit and gain.  The use of deception and fraud to procure cheap, exploited labor is a common and very successful method of those engaged in more extreme forms of exploitation: i.e., those trafficking in persons.  *See, e.g.,* Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), Pub. L. 106-386, 114 Stat. 1466, 22 U.S.C. § 7102(8)(B) (defining "severe forms of trafficking in persons" as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery").

As a direct result of such tactics, organized trafficking in persons is one of the most lucrative illicit businesses worldwide and is extremely profitable for individual perpetrators of trafficking abuses.  The United States Congress explicitly recognizes that the scope of the

---

[39] Complaint ¶ 18.

[40] The Vila-Nielsens' employment relationship with Ms. Gonzalez also meets all the elements of a claim for unjust enrichment: (1) Ms. Gonzalez conferred a benefit on the Vila-Nielsens by working for them; (2) the Vila-Nielsens had knowledge of this benefit; and (3) the Vila-Nielsens accepted the benefit of Ms. Gonzalez's work under such circumstances as to make it inequitable. *See United States v. Bouchey*, 860 F. Supp. 890, 894 (D.D.C. 1994).

trafficking and commercial trade in persons "substantially affects interstate and foreign commerce. Trafficking for such purposes as involuntary servitude, peonage, and other forms of forced labor has an impact on the nationwide employment network and labor market."[41]  At the extreme, trafficking by diplomats of their domestic workers clearly constitutes a recognized commercial activity.[42]

Diplomats who lure domestic workers into employment using the same tactics as a trafficker – deception and fraud – with the same goals – to acquire cheap labor for their own personal profit –engage in an illicit lucrative commercial activity.  Although the activity in the instant case did not rise to the level of trafficking, the way in which Defendants profited by deceiving Ms. Gonzales is nevertheless commercial activity.  When, like the Vila-Nielsens, diplomats sign deceptive employment contracts with domestic workers for the purposes of obtaining an A-3 or G-5 visa to bring their domestic worker to the United States, they engage in an illicit commercial activity by making false contractual agreements to provide wages and conditions that are lawful in the United States, in order to lure the workers into their employ to exploit them.  The Vila-Nielsens were able to profit generously from their employment relationship because of their false promises to and deception of Ms. Gonzalez.

**B.    According to Long-Standing Principles of Statutory Construction, the Commercial Activities Exception Must Be Interpreted So As Not to Create an "Absurd Result."**

The commercial activities exception to diplomatic immunity must be interpreted in a manner consistent with established precedent finding that consular and foreign sovereign

---

[41] TVPA § 7101(b)(12).

[42] *See also* TVPA § 7101(b)(8) (noting that "[t]rafficking in persons is increasingly perpetrated by organized, sophisticated criminal enterprises," that "[s]uch trafficking is the fastest growing source of profits for organized criminal enterprises worldwide," and that "[p]rofits from the trafficking industry contribute to the expansion of organized crime in the United States and worldwide").

immunities do *not* apply to the employment relationship between diplomats and their domestic workers. *See El-Hadad v. Embassy of the United Arab Emirates*, 69 F. Supp. 2d 69 (D.D.C. 1999), *rev'd in part on other grounds*, 216 F.3d 29 (D.C. Cir. 2000); *Park v. Shin*, 313 F.3d 1138 (9th Cir. 2002). The employment of laborers by embassies or foreign missions constitutes a commercial activity under the commercial activities exception to the Foreign Sovereign Immunities Act. *El-Hadad*, 69 F. Supp. at 74; *see also Park*, 313 F.3d at 1145 (finding "[t]he act of hiring a domestic servant is not an inherently public act that only a government could perform. To the contrary, private actors commonly employ domestic servants"). Therefore, foreign governments are not immune to suit in U.S. courts in actions brought by their employees. The United States Department of State also adopts this interpretation of the application of the commercial activities exception to foreign sovereign immunity in the hiring of employees by U.S. embassies and missions abroad.[43]

Similarly, the Ninth Circuit has found that a consular official's employment of private servants in his home does not constitute a consular function under the Vienna Convention on Consular Relations. *Park*, 313 F.3d at 1143. The consular official in *Park* was therefore not entitled to immunity for that employment relationship. *Id.* Therefore, consular officials do not have immunity with respect to actions brought by their domestic workers where the complained of acts were not performed in the exercise of a consular function. The commercial activities

---

[43] Gilda Brancato, Office of the Legal Advisor, U.S. Dep't of State, Letter providing departmental guidance on the applicability of United States labor laws to foreign missions and their non-diplomatic personnel, at 3, Oct. 23, 1990 (stating "[t]he courts of many countries have concluded that the employing of local residents is a commercial activity and that foreign sovereigns are therefore not immune to lawsuits arising out of these employment relationships" and "[e]mployment of local nationals by diplomatic or consular mission is generally deemed to constitute commercial activity, at least to the extent that what is at issue in litigation is benefits provided under terms of employment or under local labor law… claims for labor benefits or breach of contract money damages can generally be adjudicated by local courts").

exception under the Vienna Convention on Diplomatic Relations should be construed in light of these decisions.

The canons of statutory construction require that laws be read to "avoid absurd results." *See United States v. Schneider*, 14 F.3d 876, 880 (3d Cir. 1994). It would be an "absurd result" for this Court to find that diplomatic immunity prevents a diplomat from being held accountable for the exploitation of domestic workers, when neither sovereign immunity nor consular immunity protect foreign governments or consular officials from being held accountable for the same actions. Such an inconsistency would mean that if a domestic worker happens to work for a diplomat, she is without remedy, but if she happens to work for a consular official or for the embassy directly, she has an available remedy. Such a result would create an illogical gap in the accountability of foreign states and their representatives to the domestic workers they employ in the United States.

**C.    The Commercial Activities Exception to Diplomatic Immunity Should Be Interpreted in a Manner Consistent with United States Policy and International Law.**

**1.    The commercial activities exception should be interpreted in a manner consistent with the United States government's efforts to eradicate trafficking.**

Policy reasons should also guide the Court's analysis in determining that the employment of domestic servants by diplomats constitutes a commercial activity within the exception to diplomatic immunity. By finding immunity and allowing diplomats to engage in this unlawful conduct with impunity, the Court would encourage the continued exploitation of domestic workers that can rise to the level of trafficking. This would contradict recent comprehensive legislation to prevent and combat such crimes and provide redress for victims.

In 2000, Congress enacted the Trafficking Victims Protection Act ("TVPA") to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly

18

women and children, to ensure just and effective punishment of traffickers, and to protect their

victims."[44]  Congress passed the TVPA in recognition of the fact that "the degrading institution

of slavery continues throughout the world," including in the United States.[45]

According to Congress, "[t]raffickers primarily target women and girls, who are

disproportionately affected by poverty, the lack of access to education, chronic unemployment,

discrimination, and the lack of economic opportunities in countries of origin.  Traffickers lure

women and girls into their networks through false promises of decent working conditions at

relatively good pay as nannies."[46]  As recognized in annual reports released by the State

Department and Department of Justice, a significant number of victims are trafficked into

domestic work.[47]

Congress passed the TVPA in large part because "[e]xisting legislation and law

enforcement in the United States … are inadequate to deter trafficking and bring traffickers to

justice, failing to reflect the gravity of the offenses involved"[48] and because "[e]xisting laws

often fail to protect victims of trafficking" often "[punishing them] more harshly than the

traffickers themselves."[49]

---

[44] TVPA § 7101(a).

[45] Congress estimated that 50,000 women and children were trafficked into the United States each year.  TVPA § 7101(b)(1).

[46] TVPA § 7101(b)(4).

[47] U.S. Dep't of State, *Trafficking in Persons Report, 2003,* Jun. 11, 2003 *available at* http://www.state.gov/g/tip/rls/tiprpt/2003/21262.htm; Civil Rights Div., U.S. Dep't of Justice, *Report on Activities to Combat Human Trafficking, Fiscal Years 2001-2005, available at* http://www.usdoj.gov/crt/crim/trafficking_report_2006.pdf.

[48] TVPA § 7101(b)(14).

[49] TVPA § 7101(b)(17).

As comprehensive legislation aimed at protecting victims and providing them forms of redress, the TVPA expands the definition of forced labor under United States law and creates criminal penalties for forced labor, deprivation of legal documents, and trafficking in persons.[50] The TVPA also creates protections for victims of trafficking, giving them temporary legal immigration status and access to government benefits and services.[51]  Congress observed that

> [b]ecause victims of trafficking are frequently unfamiliar with the laws, cultures, and languages of the countries into which they have been trafficked, because they are often subjected to coercion and intimidation including physical detention and debt bondage, and because they often fear retribution and forcible removal to countries in which they will face retribution or other hardship, these victims often find it difficult or impossible to report the crimes committed against them or to assist in the investigation and prosecution of such crimes.[52]

By criminalizing trafficking and providing special benefits for victims through the TVPA, Congress aimed to ensure that victims did not continue to fear asserting their rights against their abusers.  In 2003, Congress found that, since the passage of the TVPA, "victims of trafficking have faced unintended obstacles in the process of securing needed assistance."[53] Congress addressed these obstacles by creating a private right of action under the Trafficking Victims Protection Reauthorization Act; this private right of action was designed to ensure that all victims of trafficking had some form of redress.[54]

---

[50] TVPA § 7109.

[51] TVPA § 7105.

[52] TVPA § 7101(b)(20).

[53] Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), Pub. L. No. 108-193, § 2(3) 117 Stat. 2875 (2003).

[54] TVPRA § 4(a)(4)(A).

A finding that diplomats, including Defendants, are immune to prosecution or civil suit under the Vienna Convention on Diplomatic Relations for the labor abuses arising out of their employment of domestic workers would effectively carve out a population of workers excluded from the robust protections afforded to victims under the TVPA, as well as other U.S. employment and labor law.  When Congress passed the TVPA, calling trafficking "a transnational crime,"[55] "a serious offense,"[56] and "an evil requiring concerted and vigorous action,"[57] it did not contemplate that a category of TVPA offenders would be immune from suit and that a category of common trafficking victims would have no remedy in U.S. courts.

Since the passage of the TVPA, the U.S. government's efforts to eliminate human trafficking in the United States and abroad have grown substantially, including through efforts by the Department of State, the Department of Justice and the Department of Homeland Security.[58]  Given the U.S. government's efforts to eliminate trafficking in persons in the United States, it would be inconsistent with the expressed policy of the United States government for this Court to hold that domestic workers cannot seek redress in court for abuses committed against them.

### 2.	The commercial activities exception must be interpreted in a manner consistent with international law.

Throughout the second half of the 20th Century and into the 21st, the United States has championed universal human rights and spearheaded the establishment of foundational human rights documents and instruments.  Today, the United States leads the international community in preventing and eradicating one of the most egregious human rights violations: modern-day

---

[55] TVPA § 7101(b)(24).

[56] *Id.*

[57] TVPA § 7101(b)(21).

[58] *See, e.g., supra* n.47.

slavery and trafficking in persons.  This Court should interpret the commercial activities

exception to diplomatic immunity in a manner consistent with international law and with

international efforts to address human trafficking and the exploitation of human labor.

The very abuses experienced by domestic workers employed by diplomats in the United

States, from wage violations to involuntary servitude, are defined and condemned in various

declarations, treaties, and United Nations resolutions.[59]  In 2004, the conditions of employment

of migrant domestic workers worldwide and, in 2002, the conditions of migrant workers in the

United States, were the subjects of special investigations and reports by the United Nations

Special Rapporteur on the Human Rights of Migrants.[60]  The U.S. has also undertaken specific

---

[59] *See, e.g.,* Universal Declaration of Human Rights, Dec. 10, 1948, G.A. res. 217A(II), U.N. Doc. A/810 at 71; Slavery, Security, Forced Labor and Similar Institutions and Practices Convention of 1926, art.1(I), Sept. 25, 1926, 60 L.N.T.S. 253, *entered into force for the United States* Mar. 21, 1929; Convention Concerning Forced or Compulsory Labor (ILO No. 29), June 28, 1930, 39 U.N.T.S. 55; Supplementary Convention on the Abolition of Slavery, the Slave Trade and Institutions and Practices Similar to Slavery, art. 1, Apr. 30, 1956, 226 U.N.T.S. 3, *entered into force for the United States* Dec. 6, 1967; American Declaration of the Rights and Duties of Man, Apr. 1948, O.A.S. Res. XXX; Abolition of Forced Labor Convention (ILO No. 105), June 25, 1957, 320 U.N.T.S. 29, *entered into force for the United States* Sept. 25, 1991; International Covenant on Civil and Political Rights ("ICCPR"), Dec. 16, 1966, G.A. res. 2200A(XXI), U.N. Doc. A/6316, 999 U.N.T.S. 17, *entered into force for the United States* Jun. 8, 1992; International Covenant on Economic, Social and Cultural Rights, Dec. 16, 1966, G.A. res. 2200A(XXI); Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, G.A. res. 39/46, *entered into force for the United States* Oct. 21, 1994; Convention on the Elimination of All Forms of Discrimination Against Women, Dec. 18, 1979, G.A. res. 34/180, U.N. Doc. A/34/46; International Convention on the Protection of the Rights of All Migrant Workers and Members of their Families, Dec. 18, 1990, G.A. res. 45/158, annex, U.N. Doc. A/45/49; Protocol to Prevent, Suppress and Punish Trafficking in Persons Especially Women and Children, Supplementing the United Nations Convention against Transnational Organized Crime, Nov. 15, 2000, G.A. res. 25, annex II, U.N. Doc. A/45/49, *entered into force for the United States* Dec. 3, 2005; United Nations General Assembly Resolutions on Traffic in Women and Girls, 50/167 (Feb. 16, 1996), 51/66 (Jan.31, 1997), and 52/98 (Feb. 6, 1998).

[60] U.N. ESCOR, Hum. Rts. Comm., 60th Sess., U.N. Doc. E/CN.4/2004/76 (2004); U.N. ESCOR, Hum. Rts. Comm., 59th Sess., U.N. Doc. E/CN.4/2003/85 (2002).

obligations to ensure that all workers enjoy certain basic enforceable rights by way of treaties it has signed and ratified.  For example, under the International Covenant on Civil and Political Rights, Article 22 states that "[e]veryone shall have the right to freedom of association with others, including the right to form and join trade unions for the protection of his interests."[61] Also, Article 12 guarantees the right to liberty of movement, another violation frequently experienced by these domestic workers,[62] and Article 26 guarantees the right to equal protection of the law.[63]  Also, under the International Convention on the Elimination of All Forms of Racial Discrimination, Article 5 requires State Parties to "guarantee the right of everyone . . .  to equality before the law," notably in the enjoyment of the following rights: "(i) the rights to work, to free choice of employment, to just and favourable conditions of work, to protection against unemployment, to equal pay for equal work, to just and favourable remuneration" and "(ii) the right to form and join trade unions."[64]

   In addition, the United States has actively participated in and promoted international efforts to prohibit and define the most severe form of exploitation of domestic workers: trafficking in persons.  As Congress found in the Trafficking Victims Protection Act, trafficking "involves grave violations of human rights and is a matter of pressing international concern."[65] Towards this end, the U.S. also signed and ratified the Protocol to Prevent, Suppress and Punish

---

[61] ICCPR art. 22.

[62] ICCPR art. 12.

[63] ICCPR art. 22.

[64] International Convention on the Elimination of All Forms of Racial Discrimination, art. 5, G.A. res. 2106 (XX), Annex, 20 U.N. GAOR Supp. (No. 14) at 47, U.N. Doc. A/6014 (1966), 660 U.N.T.S. 195, *entered into force* Jan. 4, 1969.

[65] TVPA § 7101(b)(23).

Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention against Transnational Organized Crime of 2000 ("Trafficking Protocol").[66] The United States Department of State has since devoted considerable resources to international cooperation in eradicating trafficking by, for example, assisting countries in drafting anti-trafficking legislation, training national law enforcement in identification and prevention of trafficking rings, and engaging in joint task forces to investigate and monitor criminal organizations that traffic in persons.[67]

Moreover, international law recognizes victims' rights to an effective remedy for violations of their fundamental rights. The Universal Declaration of Human Rights establishes that "[e]veryone has the right to an effective remedy by the competent national tribunals for acts violating the fundamental rights granted him by the constitution or by law."[68] By having signed and ratified the International Covenant on Civil and Political Rights, the U.S. is bound by Article 2, which provides that everyone shall be entitled to recourse and a remedy for violations of their fundamental rights regardless of whether the violations were committed by persons acting *within the course of their official duties*.[69] In certain circumstances, this should also include violations

---

[66] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention against Transnational Organized Crime of 2000 ("Trafficking Protocol"), Dec. 13, 2000, G.A. res. 55/25, annex II, 55 U.N. GAOR Supp. (No. 49) at 60, U.N. Doc. A/45/49 (Vol. I) (2001), *entered into force* Dec. 25, 2003.

[67] *See generally* U.S. Dep't of State, *Trafficking in Persons Report, 2006*, Jun. 5, 2006, *available at* http://www.state.gov/g/tip/rls/tiprpt/2006/65983.htm.

[68] Universal Declaration of Human Rights art. 8.

[69] The International Covenant on Civil and Political Rights establishes that no person shall be held in slavery or servitude or required to perform forced or compulsory labor. ICCPR art. 8(1-3). The ICCPR requires that every State Party, which includes the United States, undertake "to ensure that any person whose rights or freedoms [recognized in the ICCPR] are violated shall

committed by private actors.[70]  Further, the Trafficking Protocol requires that each State Party,

which includes the United States, "shall ensure that its domestic legal system contains measures

that offer victims of trafficking in persons the possibility of obtaining compensation for damage

suffered."[71]

United States and international law grants migrant domestic workers of diplomats the

rights to be free from wage and hour abuses, discrimination, forced labor and trafficking, among

other rights.  Allowing diplomatic immunity to bar domestic workers from having their day in

U.S. courts and depriving them of their entitlement to a remedy is inconsistent with binding

international obligations on the United States to provide a remedy to victims of severe labor

abuses.  Denying domestic workers exploited by diplomats a remedy renders meaningless the

most fundamental international legal protections against exploitation and slave labor.

By denying the present motion, the Court will protect the fundamental rights of domestic

workers and ensure that victims of deplorable abuses have an opportunity for redress.

---

have an effective remedy, notwithstanding that the violation has been committed by *persons acting in an official capacity*" (emphasis added).  ICCPR art. 2(3)(a).

[70] *See Velasquez Rodriguez v. Honduras*, Inter-American Court of Human Rights (series C), No. 4 (July 29, 1988), *available at* http://www1.umn.edu/humanrts/iachr/b_11_12d.htm.  In this case, the Court interpreted a provision in the American Convention on Human Rights nearly identical to the ICCPR's requirement that states "ensure" the rights recognized in that treaty and holding that the state's duty extends to private actor violations.  The Inter-American Court held that "when the State allows private persons or groups to act freely and with impunity to the detriment of the rights recognized by the Convention …. the State has failed to comply with its duty to ensure the free and full exercise of those rights to the persons within its jurisdiction."  According to *Velasquez Rodriguez,* states have an obligation to investigate, prosecute, and punish human rights violators, and that this duty must be implemented through the state's judicial tribunals.

[71] Trafficking Protocol art. 6(6).

## CONCLUSION

For the reasons set forth above and in Plaintiff's brief, *amici* respectfully urge this Court

to deny Defendants' Motion to Dismiss.


Date:  January 26, 2007

Respectfully submitted,

Steven B. Fabrizio (D.C. Bar. No. 436482)
Carol M. Wilhelm*
Martina E. Vandenberg (D.C. Bar No. 476685)
Anne E. Ralph*
JENNER & BLOCK LLP

601 Thirteenth Street, N.W., Suite 1200
Washington, D.C.  20005
(202) 639-6000


Claudia Flores*
Lenora Lapidus*
Jennifer Pasquarella* (pending admission)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION- WOMEN'S RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004

*Attorneys for Amici Curiae*
*not admitted in this District

# APPENDIX A

## STATEMENTS OF INTEREST OF AMICI CURIAE

### THE AMERICAN CIVIL LIBERTIES UNION

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan organization of more than 500,000 members dedicated to preserving the Bill of Rights. The ACLU Women's Rights Project, founded in 1972 by Ruth Bader Ginsburg, is a leader in efforts to eliminate the barriers to women's full equality in American society. The Women's Rights Project believes that in order to truly achieve equality for women, the most vulnerable populations of women – poor women, immigrant women, and women of color – must have access to economic opportunity and enjoy freedom from discrimination and exploitation. Discrimination against and exploitation of domestic workers is an especially pernicious problem for immigrant women, who also encounter other considerable obstacles to enforcing their rights. Accordingly, the ACLU Women's Rights Project seeks to ensure that the rights of immigrant women workers do not continue to be imperiled and that victims of discrimination and exploitation have access to justice.

### BREAK THE CHAIN CAMPAIGN

Break the Chain Campaign ("BTCC"), a project of the Institute of Policy Studies, works with domestic workers who are victims of trafficking in persons and/or labor exploitation in the Washington, DC area. BTCC has worked with exploited and abused domestic workers since 1997. BTCC provides direct legal and support services to abused workers, assists on cases nationally, and advocates for policy reform regarding human trafficking and labor exploitation. Over the years, numerous domestic workers exploited by diplomats have sought assistance at BTCC.

## CASA OF MARYLAND

CASA of Maryland ("CASA") has worked for more than twenty years to advance the rights of low-wage workers, especially immigrant workers.  CASA attorneys have represented sixteen women who served as domestic workers for diplomats in the Washington D.C. metropolitan area, including four cases in which the diplomats had engaged in human trafficking. CASA has also represented more than a hundred domestic workers in cases not involving diplomat employers.  CASA has negotiated on behalf of the domestic employees of diplomats, engaged the workers in public advocacy, and worked with the U.S. Department of State and foreign embassies in Washington, D.C. to improve the treatment of domestic workers.

## GLOBAL RIGHTS – PARTNERS FOR JUSTICE

Global Rights – Partners for Justice ("Global Rights") is a non-profit organization of human rights and legal professionals engaged in human rights advocacy, litigation, and training around the world.  Founded in the District of Columbia in 1978, Global Rights (formerly the International Human Rights Law Group) works to empower advocates to expand the scope of human rights protection for men and women and to promote broad participation in creating more effective human rights standards and procedures at the national, regional, and international levels.  Global Rights has represented individuals and organizations before U.S. and international tribunals and has appeared as amicus curiae in a number of U.S. cases.  Beginning in the 1990s, a central focus of Global Rights' work has been to promote the use of international human rights law and standards in efforts to protect women's rights and to combat racial discrimination. Global Rights joins this brief to emphasize the responsibilities of the United States under its international treaty obligations to ensure that legal remedies are available to all people – regardless of their employment situation – who suffer violations of their human rights.

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 26th day of January 2005, a true and correct copy

of the foregoing documents were delivered via U.S. mail to:


Michael E. Veve, PLLC
Lasa, Monroig & Veve, LLP
1250 Connecticut Avenue, N.W.
Suite 200
Washington, DC  20036

Thomas F. Connell
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006

Muneer I. Ahmad, Esq.
International Human Rights Law Clinic
American University Washington College
4801 Massachusetts Avenue, N.W.
Suite 417
Washington, DC  20016

Anne E. Ralph